YATES and others, Ex'rs, &c. of John B. Yates, *vs.* HENRY YATES and others.

All uses and trusts, except as authorized and modified in the article of the revised statutes respecting uses and trusts, are abolished.  No express trusts can any longer be created, except those enumerated in the 55th section of that article, and that section is alone to be looked at in determining the question of the validity or invalidity of an express trust.

Trusts of real property, for *charitable uses*, are within the prohibition of the statute, and are not valid in law, unless of the description authorized by the act of 1840 respecting grants and conveyances to colleges and other literary institutions, and made to such trustees as are therein authorized to hold.

A testator, by his will, conveyed his property, real and personal, to trustees, in trust for the purposes of such will.  He first directed the payment of his debts and certain specific legacies, by the trustees.  He then further directed that the trustees should apply the remainder of his property, if any there should be, to the endowment and support of a school, to be called the Polytechny.  And the will provided that if, after winding up and settling the affairs of the testator the trustees should ascertain that there were funds sufficient left to commence and found the school, they should petition the legislature of this state to accept the devise, for the object of endowing

Yates *v.* Yates.

and supporting the Polytechny, upon the testator's plan; to confirm its permanency by a legislative act, and make the necessary arrangements for its uniform and steady government. And if such a law could not be obtained in this state, to the satisfaction of the trustees, then the residue of the testator's estate was to be disposed of, and the money received therefor invested, until the sum of $100,000 should be funded, when the trustees were to form the institution in any state which was willing to give the proper irrevocable legal guaranty for its performance, and appropriate not less than 1000 acres of land for the purpose.

*Held,* 1. That the trust created by the will, so far as related to the residue of the testator's estate after the payment of debts and specific legacies, was invalid, for the reasons, 1st. That the trust created was not authorized by law; 2d. That if it were regarded as an express trust or a power in trust, or an executory devise, the power of alienation was suspended for an indefinite term, not measured by a designated life or two lives in being, but by contingent events.

2. That the remainder of the real estate, after the payment of debts and legacies, descended to the heirs at law of the testator; and that so much of the personal estate as had been accumulated and invested for the support of the Polytechny, by a sale of the real property, or which was not required for the payment of debts and legacies, passed to his next of kin.

The law against the suspense of alienation of real or personal property, is applicable to every species of conveyance and limitation, whether it be by deed or will; whether it be directly to a party competent to hold property, or indirectly, in trust or to the use of such party, or to one hereafter to come into existence; and whether limited by an executory devise, or a springing use, and whether in the form of a power in trust, or of a legal express trust.

If, therefore, there be an express trust, or an executory devise, or a power in trust, with a valid and legitimate object for charitable uses, and in all other respects unexceptionable, yet if the estate depends on conditions as to the time of vesting which suspend the alienation for a period not measured by a life or two lives in being, it is equally as void as if the object had been illegal. *Per* Wright, J.

Independently of the statute of charitable uses, the English courts of equity possessed and exercised an inherent jurisdiction over charitable trusts. Yet it is not to be controverted that the law of charities, as it prevailed in England and in the colony of New-York, on the 19th of April, 1775, and which was a part of that common law which the constitution of 1777 recognized and adopted, was mainly, if not exclusively, founded upon and derived from the provisions of the statute of Elizabeth. *Per* Wright, J.

Since that statute no bequests have been deemed within the authority of chancery, and capable of being established and regulated thereby, except bequests for those purposes which that statute enumerates as charitable,

or which by analogy are deemed within its spirit and intendment. *Per* WRIGHT, J.

There is no affirmative evidence that the statute of charitable uses was not in force in this state when a colony. The presumption is that it was. *Per* WRIGHT, J.

IN EQUITY. The bill in this cause was filed for the construction of a will. John B. Yates died in July, 1836, leaving real and personal property. His will, made in November, 1834, and which was duly admitted to probate in the county of Madison, was as follows, (omitting such parts as do not affect the controversy between the parties :)

"I give, devise and bequeath *all my estate, real and personal,* of whatsoever description the same may be at the time of my death, to my beloved wife Mary Elizabeth, my nephew Charles Yates, my friends William K. Fuller and George K. Fuller, as joint tenants and not tenants in common, *in trust,* for the purposes hereinafter named. And whereas my wife may again be married, and in consequence of such an event, embarrassment may be experienced in the execution of the trust contained in this will—for the purpose of avoiding any difficulties she might possibly be subjected to, and not from any want of confidence in either her decision of character or benevolence, it is then my wish that the other persons named as trustees, or such of them as may be willing to do so, take upon themselves the execution of the trusts hereby created. My said trustees are also authorized to appoint one of their number, or any other competent person, with a sufficient allowance as a compensation therefor, to attend to the business; to require from such person requisite security, and to revoke or alter such appointment at their pleasure.

I desire that a full inventory of my property be made, with a particular account of my indebtedness, and that provision be made for the payment of those debts, by the sale of such property as may be disposed of to the best advantage, except the estate at Chittenango and its vicinity, unless it shall be necessary to fulfill engagements. Having had but one important object in view in the purchase and extension of the Chittenango

property, I yet anxiously hope circumstances may not require its abandonment. Aware, however, of the uncertain result in winding up so complicated a concern as my business has been, and the various loads that have been thrown upon it by my own credulity and want of caution, as well as want of sufficient precision in its detailed arrangements, I feel apprehensive that sufficient means to retain it for the desired object may not be left. It is therefore my will, if it shall become necessary to sell that estate, or any part of it, that it be done as follows: All the grounds suitable for village lots to be laid out by actual measurement, in lots not to exceed fifty feet wide by two hundred feet in length, or less, as shall be thought most advantageous in the particular situation of such lots: *And when at least six months' notice, from time to time, of such portions as shall be offered,* shall have been given, and the terms of credit named, they may be sold either at private or public sale, as shall be thought most advantageous by my said trustees; the number of the lots, the time and terms of sale, being left to their discretion. The sale of village lots will always be necessary for the advantage of the place: whether, therefore, the proceeds may be required for the payment of debts or not, they must continue to sell all that may be required; and when the proceeds shall not be required to pay debts or legacies, *they shall be invested for the support of the institution hereinafter provided for.* I have some doubt with regard to the propriety of requiring the preservation of the machinery for mechanical employment by the scholars. If that can be preserved for a full experiment, I would desire it; but if not, my trustees *are authorized to sell that or any other part of my estate they may deem necessary, to fulfill the object of the will as nearly as possible.*"

The will then proceeded to make certain dispositions of a portion of the testator's estate. It directed that $2000 annually should be paid to his wife during her life, that she should have the possession and direction of what he called the Walnut Grove farm, and be paid the sum of $500 annually for the purpose of improving it. It also gave to the testator's wife the household furniture, all the pleasure carriages and harness, and all the

Yates *v.* Yates.

wagons, sleighs, and other materials used in and about the dwelling house and lot; also one pair of horses for the carriage, and one pair of farm horses, together with the old horse Buonaparte. Also the use and direction of the library during her natural life, and after her death, the library to be appropriated for the *Polytechny.*

A legacy of $10,000 was given to Elizabeth Van Slyck, wife of Nicholas Lawrence; a legacy of $2500 to Mrs. Sarah Fonda and her children, the income to be paid to her during her life; another of $10,000 to Henrietta, wife of John A. Yates; and another of $5000 to George K. Fuller.

The will also directed that the sum of $6000, together with the amount of such property as should vest in the testator by his sister Ann Yates, should be divided between Jane, wife of Nathan Whitney, Ann, wife of John Groat, Mary Austin Fonda, and Mary Austin and Anna, daughters of his brother Andrew, in five equal portions, excepting however the family mansion and lot in Schenectady, which he devised to Charles, the son of his brother Henry, and one of his trustees.

The will then concluded as follows: "I direct farther, that my said trustees apply the remainder of my property, my real and personal estate, if any there shall be, *to the endowment and support of a school, embracing literary instruction, combined with the pursuits of real life of every practical description. The institution to be called the Polytechny, upon the plan, as near as may be, laid down in the memorial presented by me to the legislature of the state of New-York, and the report of a committee and draft of a law founded thereon, during the session of the year* 1830. *If after winding up my affairs, it shall be ascertained that there are funds sufficient left to commence and found such institution,* I then wish my trustees aforesaid to petition the legislature of this state to accept this devise for the object named, to confirm its permanency by a legislative act, and make the necessary arrangements for its uniform and steady government by the appointment of a governor or director, who shall not be liable to removal by the fluc-

tuations of party, or the miserable *charlatanry* of political jugglers.

If such a law, *to the satisfaction of my said trustees,* can not be obtained in this state, I then direct that as soon as may be, without incurring unnecessary loss, my whole estate left after the legacies and devises, be disposed of, on the terms and in the manner that shall be thought most advantageous; and as it shall from time to time be disposed of or sold in such portions as may be offered at the various times, and the money received therefor, that the same be invested until the sum of $100,000 be funded; and they are requested in that event to form such an institution in any state a majority of them please to select, which is willing to give the proper irrevocable legal guaranty for its permanency, and appropriate not less than one thousand acres of land for the purpose. The income only of the $100,000 to be applied in this last case to the support of the institution, and the principal to be transferred to the state, and kept by it invested for a school of this description. If afterwards, a greater residuary sum than this shall be realized, I then direct that the balance, not exceeding $100,000, be offered on the same terms to another state; and if more be left, that the same course be pursued with the balance in a third state, and so on, until the whole residuary estate be thus applied and absorbed in amounts not exceeding, as above, $100,000 to each.

Having ascertained with certainty to my own mind, that almost all political men of all parties are more particularly anxious for personal aggrandizement than any permanent arrangement by which the general standard of popular information may be raised, and thus greater stability be given to the political institutions of our country, I am apprehensive of the same secret opposition which I have experienced and which I know exists to every project of this sort. It is, therefore, my wish that a printing press, and weekly paper at least, devoted to the purpose of advocating the diffusion of literary information among all classes of people, be established, connected with the institution; and that printing and book-binding in all its branches, form a branch of the mechanical occupation of a portion of the

Yates v. Yates.

institution. It is also my will that a professorship of law be established, and that every student be made familiar with the constitution of the United States, and each state in the Union, at as early an age as possible, and to be connected throughout with the moral and religious instruction of the institution. Being also firmly persuaded that the safety of society, and its proper moral government, can not be sustained without a high regard for the present legal domestic relations of life, it is, therefore, my wish that no illegitimate child shall be admitted into the institution, whose parents shall not have legally intermarried, either before or after the birth of the child, and that such prohibition be made a fundamental law of each institution which may be established under this will. If my life shall not be spared to settle my estate myself, and ascertain its value, so as to know accurately what may be left for this purpose, and also to enable me to form a more full and detailed plan for the government and management of the institution, and the specific appropriation for each object, which from the uncertainty of the amount I can not now do, I leave the manner and extent of the arrangements to the sound discretion of my said trustees, in conjunction with my friends, John Savage, chief justice of the state, John Van Ness Yates, of Albany, and John C. Spencer, of Canandaigua, whom I solicit to aid my trustees by their counsel and advice in organizing and establishing the said institution."

The debts and liabilities of the testator, exclusive of $33,500 of legacies to be provided for, amounted at his death to upwards of $300,000. A large portion of his real estate was situated in the county of Madison, on which there were various mortgages, amounting to the sum of $126,000. In May, 1841, the trustees effected a settlement with the widow, by securing to be paid to her the sum of $5,800, and the punctual payment of the annuities bequeathed to her by the will, and she released all interest in the real and personal estate except as devised and bequeathed to her by such will. Portions of the property had been sold, but the real estate in and about Chittenango had been retained for the ultimate purposes stated in the will. A part of the legacies and debts of the testator had been paid by the trustees.

The largest item of the testator's personal estate consisted of an interest in the Welland Canal Company, of the province of Upper Canada, of which the trustees had, after delay, negotiation, trouble and expense, received a part, and made such further arrangements as it was believed would secure the remainder in about the year 1851. The sum received from the Welland canal investment had been applied to the payment of the testator's debts; and it was believed by the trustees that the back interest of such investment, if realized, would be sufficient to liquidate the remaining claims against the estate.

The trustees stated in their bill that they had been advised by counsel, that so much of the will as relates to the legacies, devises, and bequests, other than the residuary devise and bequest therein, are valid; and as to so much of the will as directs the trustees to apply the remainder of the testator's real and personal estate, if any there shall be, to the endowment of a school in the state of New-York, to be called the " Polytechny," and all the provisions of the will relating thereto, and also the other provisions to form similar institutions in other states, upon certain contingencies mentioned in the will, and the provisions in the will relative thereto, they were not fully advised; and for greater certainty as to the residuary devise and bequest in the will for the purposes aforesaid, or of so much of the will as directs the application of the remainder of the real and personal estate of the testator, in the manner and for the purposes therein stated, they prayed that a judicial construction by this court might be given to so much of the will as begins with the words, " I direct further that my said trustees apply the remainder of my property, my real and personal estate, if any there shall be, to the endowment and support of a school," &c., and of all the provisions in the will incident or relative thereto, and of all questions relative to the application of the testator's real and personal estate for the endowment and support of a school or schools; so that the trustees might be fully advised whether the residuary real and personal estate was vested in them for the purposes mentioned in the will, or in the heirs at law of, and next of kin to, the testator, or how otherwise the same did vest.

Yates v. Yates.

*S. Beardsley* and *S. Sherwood*, for the complainants.

*S. Stevens*, for Henry Yates and others.

*J. C. Spencer*, for A. G. Fonda and others.

*N. Hill, Jr.* for Mary A. Stuyvesant and others.

*By the Court*, WRIGHT, J.   The intent of the testator, manifested by his will, was, after the payment of debts and legacies, to appropriate the remainder of his large estate, real and personal, to the endowment and support of a school "embracing literary instruction, combined with the pursuits of real life of every practical description;" the institution to be called the Polytechny, and to be formed upon the plan, as near as might be, laid down in a memorial presented by him to the legislature of the state of New-York, and the report of a committee and draft of a law founded thereon, during the session of the year 1830. The object, therefore, for which the testator attempted to create a trust of the residuum of his estate was laudable, though the scheme for effectuating it should be regarded as impracticable, and inconsistent with the rules of law.   The intent was charitable, and the public were eventually to be the beneficiaries of the use.   The end in view was to aid in raising the standard of popular information, and thus, as the testator himself expresses it, "to give greater stability to the political institutions of the country."

But though the object, in itself considered, may be meritorious, it must fail if the testator has attempted to carry it out in hostility to established legal rules.   The duty of the court is to expound and declare the law, not to make it.   The predilections of the judge form no excuse for encroachment upon the province of the legislature.   If the testator has aimed at the creation of a trust not authorized by law, or if during the continuance of such trust, the power of alienation is suspended, and the trust term is not legally limited, the trust is invalid, the intent of the testator has failed, and so much of his estate as was the

subject of the void trust is vested in his heirs at law and next of kin. So, also, if the trust created may be lawfully performed under a power, and the absolute power of alienation is not limited according to law, the power in trust is void, as powers in trust are subject to the same rules, as to the suspension of the power of alienation, as direct trusts. (*Hawley* v. *James*, 16 *Wend.* 135, 178.) And let me remark, that although a laudable charity may be defeated by applying the provisions of law prohibiting perpetuities, the wisdom of those provisions is not to be summarily impugned. In England, for a long period, the common law courts struggled, aided occasionally by the legislature, against a disposition of the aristocracy to tie up and fetter inheritances indefinitely, to withdraw them from the world of commerce, and prevent their free and untrammelled transmission from man to man. If to render the property and accumulated wealth of England inalienable for an unreasonable length of time, was an evil demanding the efforts of her enlightened judiciary to relieve, how greatly in this country must the evil arising from like causes be magnified. In England, perpetuities were one device for building up and sustaining aristocratical pretension; here, tending as they must, to tie up and withdraw from circulation the capital of the country, they would be at war with the principles and spirit of our institutions. It is also to be borne in mind, that alienations to pious and charitable uses have been most fruitful devices for locking up property, insomuch that in England, at one period, according to Lord Hardwicke, the clergy and religious houses had contrived to possess themselves of nearly half of the whole real property of the kingdom. (1 *Vesey*, 223.) " The term *mortmain*, (says Lewis, speaking of the British mortmain act, 9 Geo. 2, chap. 36,) as its derivation signifies, is not necessarily confined to the landed possessions of corporations ; it equally applies to all property, that, from the nature of the purposes to which it is devoted, or the character of the ownership to which it is subjected, is for every practical purpose in a dead or unserviceable hand. This, it is obvious, is the characteristic of alienations to charitable uses ; it is the very nature of such dispositions to withdraw the

Yates v. Yates.

subject of them from every kind of circulation, since a contrary course defeats their manifest object." (*Lewis on Perpetuities,* 689.) Public policy, therefore, demands that the alienation of property for any purpose shall not be unreasonably suspended. The legislature, with the experience of all christian nations before them, and with a knowledge of the mischiefs resulting from such suspension, have defined its limits. It is our duty to apply the law, though the charity may fail. It were better indeed that it should fail, than that this court should falter in giving full effect to a wise and salutary restriction.

The term *charity* does not extend to particular gifts to particular persons. A fund supplied from private gift for any legal, public or general purpose, is a charity. (2 *Sim. & Stuart,* 67, 594.) The establishment of a school for learning of any description, and donations for the establishment of colleges and schools, are charities: (2 *Howard,* 19.) As I have already intimated, the trust created by the will of the testator, of the residuum of his estate, is for a charitable use. It is intended as a public charity. The question therefore is, can it be executed?

The counsel for the trustees concede that this charity would not be good in England, on account of the mortmain act. (9 *Geo.* 2, *chap.* 36.) That act avoids all devises to charitable uses. But were it not for that act, they insist, it would be good, and that the court of chancery, by virtue of an original inherent jurisdiction, independent of the statute of 43d Elizabeth, commonly called the statute of charitable uses, would enforce its execution; that the English law of charities, including that which authorizes a court of equity to carry them into effect, was not derived from or founded on the statute of 43d Elizabeth, but was a part of the common law of England before and since that statute was enacted; and being so, it became a part of the law of this state by constitutional adoption. The conclusion deduced is, that (conceding the statute of Elizabeth never to have been in force in this state, or to have been repealed,) the legislature having repealed the statutes of mortmain, and the provisions of the revised statutes as to uses and trusts having no reference to or effect upon *charitable uses and trusts,* if this charity would

be upheld in England, by virtue of the common law, independent of any statute, it should be upheld here.

Devises, bequests, and conveyances for charitable purposes were, it would seem, in some cases, enforced at law as a condition, prior to the statute of Elizabeth. (*Porter's case*, 1 *Rep.* 22.) The obligation was lawful, and on a failure to perform, the estate was forfeited. But whether the English court of chancery exercised jurisdiction over charities as such, in any shape, prior to the statute of Elizabeth, has, at least until a very recent period, been doubted. It has not been easy to arrive at a satisfactory conclusion as to how far the present authority and doctrines of the court of chancery in regard to charitable uses, depend upon the statute of Elizabeth, and how far they arise from its general jurisdiction as a court of equity to enforce trusts, and especially trusts to pious uses. (*Story's Eq. Jur.* § 1142.) It is remarkable, says Judge Story, that Sir Thomas Egerton, (who was made Lord Chancellor in 39th Elizabeth,) and Lord Coke, who argued Porter's case for the Queen, although they cited many antecedent cases, refer to none which were not decided at law. (*Story's Eq. Jur.* § 1144.) In the *Attorney General* v. *Bowyer*, 3 *Ves.* 714, 726,) Lord Loughborough stated as the result of his researches, that until about the period of enacting the statute of Elizabeth, bills were not filed in chancery to establish charities. Lord Eldon, in *Mills* v. *Farmer*, (1 *Meriv.* 55,) said that he acceded fully to the remark of Sir Arthur Pigott in argument, that "the difference between the case of individuals and that of charities is founded on a principle which has been established ever since the statute of charitable uses, in the reign of Elizabeth, and has been constantly acted upon from those days to the present." (*Moggredge* v. *Thatchwell*, 7 *Ves.* 36.) And in the case of *The Baptist Association* v. *Hart's Executor*, (4 *Wheat.* 1,) Chief Justice Marshall, in delivering the opinion of the court, elaborately considered the whole subject, and investigated all the leading authorities. In that case the court arrived at the conclusion, "that charities, where no legal interest is vested, and which are too vague to be claimed by those for whom the beneficial interest was intended, could not be established by

a court of equity, either exercising its ordinary jurisdiction, or exercising the prerogative of the king as *parens patriæ* before the statute of Elizabeth." More recent examinations of the subject, however, would seem to lead to the conclusion that the court of chancery, prior to the statute of Elizabeth, exercised jurisdiction in cases of charities, and that this statute only created a new and ancillary jurisdiction. From the report of the commissioners on public records, published by the British parliament in 1827, it appears, by a number of instances previous to the statute, that cases where there were trustees appointed for general and indefinite, as well as for specific charities, were known to, acted upon and enforced in the court of chancery. (*Story's Eq. Jur.* § 1154. 1 *Cooper's Public Records,* 355 ) In 1826, Lord Eldon, in the case of *Attorney General* v. *Skinners' Co.,* (2 *Russ. Ch. R.* 407,) took occasion to express a doubt whether his former opinion had been strictly correct. Lord Redesdale, in 1827, in *Attorney General* v. *Mayor, &c. of Dublin,* (1 *Bligh's Rep. N. S.* 312, 347,) a case before the House of Lords, said that the statute of 43d Elizabeth created no new law on the subject of charitable uses. It created only a new and ancillary jurisdiction. Lord Chancellor Sugden, in the more recent case of *The Incorporated Society* v. *Richards,* (1 *Drury & Warren's Rep.* 258,) arrived at the conclusion, after full examination, " that there is an inherent jurisdiction in equity in cases of charity, and that charity is one of those objects for which a court of equity has at all times interfered to make good that which at law was an illegal or informal gift, and that cases of charity in courts of equity in England were valid, independently of, and previous to, the statute of Elizabeth." And in a late case in the supreme court of the United States, *Vidal, &c.* v. *Girard's Ex'rs,* (2 *Howard's Rep.* 127,) after an elaborate discussion, the court held that there was a jurisdiction in chancery over charitable trusts, antecedent to the statute of Elizabeth, and that although this statute was never in force in Pennsylvania, yet the common law of that state had always recognized the chancery jurisdiction in cases of charity. (*See also* 6 *Paige,* 649 ; 1 *Molloy,* 616 ; *Duke on Charitable Uses,* 136, 154, 163.) The better opinion,

therefore, seems now to be, that independently of the statute of charitable uses, the English courts of equity possessed and exercised an inherent jurisdiction over charitable trusts, although formerly the contrary opinion had been held, and sustained by the highest authority.

Conceding, however, that all doubt is now at rest as to chancery exercising a sort of limited and imperfect jurisdiction over charities, prior and subsequent to the statute of Elizabeth, and independent of it, it is not to be controverted that the law of charities, as it prevailed in England and in the colony of New-York on the 19th of April, 1775, and which was a part of that common law which the constitution of 1777 recognized and adopted, was mainly if not exclusively founded upon and derived from the provisions of the statute of Elizabeth. Since that statute, Judge Story remarks, (and he is sustained by numerous authorities,) it is very certain that no bequests have been deemed within the authority of chancery, and capable of being established and regulated thereby, except bequests for those purposes which that statute enumerates as charitable, or which by analogy are deemed within its spirit and intendment. (*Story's Eq. Jur.* § 1155.) At the period of the adoption of the constitution of 1777, the opinion was certainly universal, promulgated as it had been by distinguished equity judges themselves, after learned and extensive research, that the statute of Elizabeth was the fountain from which the authority and doctrine of chancery, in cases of charity, had exclusively sprung. There is no affirmative evidence that the statute of charitable uses was not in force in this state when a colony. The presumption is that it was. "It is a natural presumption," says Chancellor Walworth, in the case of *Bogardus* v. *Trinity Church*, (4 *Paige*, 198,) "and therefore is adopted as a rule of law, that on the settlement of a new territory by a colony from another country, especially when the colonists continue subject to the same government, they carry with them the general laws of the mother country, which are applicable to the situation of the colonists in the new territory ; which laws thus become the laws of the colony until they are altered by common consent or by legislative enactment. The

common law of the mother country, as modified by positive enact-
ments, together with the statute laws which are in force at the
time of the emigration of the colonists, become in fact the com-
mon law, rather than the common and statute law of the colony.
The statute law of the mother country, therefore, when intro-
duced into the colony of New-York by common consent, because
it was applicable to the colonists in their new situation, and not
by legislative enactment, became a part of the common law of
this province." There is positive evidence that the British stat-
utes of mortmain were in force in the colony. We have then
the legal presumption in the one case, and positive knowledge in
the other, that the statute of charitable uses, and the statutes of
mortmain, were laws in force in the colony of New-York, together
with the fact that at the adoption of the constitution of 1777, the
opinion universally prevailed that the authority of chancery over
charitable trusts, was the exclusive offspring of the first named
statute, and had not grown out of the inherent jurisdiction of
that court. We have also the further fact that if at any period
in British jurisprudence her courts of equity exercised the power
of establishing and enforcing general and indefinite charities, the
law of charitable uses, as it prevailed in England and in the col-
ony of New-York at the period of our revolution, was not the
same which prevailed anterior to the statute of Elizabeth, but
was a law which had been moulded and shaped by numerous ad-
judications of chancery under that statute; the court claiming
and receiving its authority from the statute, and holding that
nothing which was not within its purview was a charity. It may
be, that looking at the provision of the constitution even under
these circumstances, it is broad enough to embrace the adoption
of those measurably undefined and unsystematized rules of the
common law in relation to charities, including those which au-
thorized a court of equity to carry them into effect, to be collected
almost wholly from unreported precedents anterior to the 43d
year of the reign of Elizabeth: but in view of the fact that until
recently it was generally supposed that equity derived its exclusive
jurisdiction and power to establish and enforce charities, as such,
from the statute passed in that year, it is difficult to conclude

that the legislature, in subsequently repealing the statute of Elizabeth, did not intend to abrogate the law of charities as it was understood to exist in England.   If they did not, the strange inconsistency with which they acted is apparent.   They retained the prohibition against corporations taking by devise, and limited the amount of property that religious corporations might hold; yet they repealed, without re-enacting, the statute of 9 *Geo.* 2, *ch.* 36, and permitted persons *in extremis* to devise to individual trustees, for charitable uses, and create perpetuities.   They approbated the policy of preventing the locking up of real property in perpetuity, while they did what could not fail to render that policy ineffectual.   Perpetuities were to be protected if the devise was to individual trustees; but otherwise, if to a corporation, though the mischief to be guarded against was the same in one case as in the other.   Devises to charitable uses had been a most fruitful mode of creating perpetuities.   This, experience had fully shown, insomuch that in Great Britain they were avoided by statute.   Yet a republican state, in which the policy of restraining perpetuities was most obvious, removes the restraint by legislative action.   These are some of the inconsistencies to be charged upon the legislature, if they did not intend, by abrogating the statute of Elizabeth, that the English law of charitable trusts, supposed by them to be founded upon it, should fall with it. (*See opinion of Duer, J. in Ayres, &c. Executors,* v. *Trustees for the Corporation of Methodist Episcopal Church, N. Y. Legal Obs. vol.* 8, *p.* 17.)

But assuming that the statute of Elizabeth never was in force in this state, or that it has been repealed; that by the common law of England and of this state when a colony, independent of any statute, charities could be established and enforced in equity; that such law became a part of the law of this state by constitutional adoption; and that anterior to the revised statutes, (the legislature having repealed the statute of 9 Geo. 2, ch. 36,) perpetuities might be created through the medium of devises to charitable uses, the trust upheld and the charity established in a court of equity; the question remains whether, under the provisions of the revised statutes respecting trusts and perpetu-

ities, the trust in the residue or surplus of the testator's estate is valid. This question may be considered in three aspects: 1. Do the provisions of the revised statutes refer to, or affect, charitable uses and trusts; and if so, does the trust under consideration, in relation to its object, conform to, or is it contrary to those provisions? 2. Is the alienation of the real, and the disposition of the personal estate, suspended by the provisions of he will in respect to the disposition of the property of the testator for the establishment of a Polytechny, contrary to the provisions of the revised statutes? 3. If the trust as to the real estate can not be supported, for want of valid objects, is there a power in trust by which the same objects can be attained?

1. All uses and trusts, except as authorized and modified in the article of the revised statutes, entitled " *Of uses and trusts*," are abolished. (1 *R. S.* 727, § 45.) No express trusts can any longer be created, except those enumerated in the 55th section of that article. In determining the question of the validity or invalidity of an express trust, we are to look to that section alone. If enumerated within its subdivisions, the trust is valid; if not, it is illegal and void, unless capable of execution as a power in trust. (§ 58.) The trust declared by the will of the testator, so far as it affects the residue of his real estate after payment of debts and legacies, is not authorized and defined by that section. The conclusion is that it is invalid; and this would seem to be conceded by the counsel for the trustees, if the statute has reference to, or affects, charitable uses and trusts. It is urged, however, that the article " *Of uses and trusts*," relates only to private trusts, and that it was not intended to affect charitable uses or public trusts; that the statute only refers to personal rights, and that the term *uses* employed in it, means such as can be enforced in favor of individuals. To ascertain the intention of the legislature in the enactment of a particular statute, courts are first to look at the words of it. These may be so simple, intelligible and unambiguous, as plainly to speak the legislative intent, leaving no room for construction. If so, we should go no further. It is not to be assumed in this case that the legislature, or those eminent and learned men who prepared

Yates *v.* Yates.

the work of revision, were ignorant of such a thing as a charitable use, or a trust for charitable purposes; that with the knowledge that gifts and devises to charitable uses had been a popular and fruitful mode of tying up estates, they unintentionally overlooked them. "Uses and trusts, except as authorized and modified in this article, are abolished." No charitable trust is authorized. The language is plain, distinct, emphatic. The abolition is of *all* uses and trusts—public or private—except those which the statute allows. No other interpretation can be placed upon the words used. The intent is plainly signified, that there should be a thorough and radical reform in this branch of the law; that there should be a total abrogation of express trusts, for any and every purpose, except as the legislature should authorize them. It is said that the statute refers to private trusts, such as may be enforced in favor of individuals. But the legislature have not said so, and courts are not to speak for them. Their language is that *all* trusts except those which are implied, and those expressly created to sell lands for the benefit of creditors, or to sell, mortgage or lease lands for the benefit of legatees or for the purpose of satisfying some charge thereon, or to receive the rents and profits of land, and either apply them to the use of a person, or accumulate them during minority, for the use of minors, are absolutely abolished. For us to interpolate another exception into the statute, would be to legislate, and that too on the supposition that neither the legislature nor the revisers, while providing a new system of uses and trusts, were aware that there was such a thing as a charitable use or trust, or that the law of charities had been and was an extensive branch of equity jurisdiction; or that knowing this, they unintentionally overlooked and omitted uses and trusts of a public and charitable nature. I am not willing to do this. It were better that we should abstain from legislation. If charitable uses and trusts should be excepted from the sweeping abolition made by the revision, the legislature alone is competent to do it.

What I have said thus far is based upon the broad, emphatic and comprehensive words of the statute. Other views may be

taken in connection with the words, to show that the legislature intended to embrace public as well as private trusts. The same mischief was to be guarded against in the one case as in the other. The same reasons of public policy were applicable to each. If by an executory devise or private trust the alienability of property could be suspended, and the same excluded from commerce, so it might be and had been in times past, through the instrumentality of a public and charitable trust. Indeed the chances that it would be in the latter way were most to be apprehended; for apart from the imposition that may be successfully practiced upon men in a dying hour, there is a desire in human nature, evincing itself strongly in some, to win in their last moments, what perhaps they have failed through life to obtain, the applause of the world as public benefactors; locking up their property and beggaring those connected with them by the ties of blood, to accomplish the end.

Again; the legislature have in some degree interpreted, by subsequent statutes, their intention, in the revision, to abolish public and charitable trusts, and to apply to them the statutory rules prohibiting perpetuities. In 1840, they provided that real and personal property might be granted and conveyed to any incorporated college or other literary incorporated institution in this state, in trust, 1st. To establish and maintain an observatory; 2d. To found and maintain professorships and scholarships; 3d. To provide and keep in repair places for burial of the dead; 4th. For any other specific purposes, comprehended in the general objects authorized by their respective charters. So also they provided that real and personal estate might be granted and conveyed to the corporation of any city, or village, to be held in trust for any purpose of education, or the diffusion of knowledge, or the relief of distress, or for parks, gardens, or other ornamental grounds, or grounds for the purposes of military parade and exercise, or health and recreation, within or near such incorporated city or village; the trusts to continue for such time as might be necessary to accomplish the purposes for which they might be created. (*Laws of* 1840, *chap.* 318.) And in 1841, they provided that devises and bequests of real and

Yates *v.* Yates.

personal property in trust for any of the purposes for which such trusts were authorized under the law of 1840, and to such trustees as were therein authorized, should be valid, in like manner as if such property had been granted and conveyed according to the provisions of that law. (*Laws of* 1841, *chap.* 26.) Prior to these statutes, it is true, corporations had been prohibited from taking *directly* by devise, unless expressly authorized by their charters or by statute; though it was not clear that they might not take, through the intervention of individual trustees, previous to the adoption of the revised statutes. There was no prohibition against their taking directly by grant for any purposes comprehended in the general objects authorized by their charters. Why then specifically authorize them to hold property in trust for public and charitable uses, if the revised statutes had not referred to or affected such trusts? Or why specifically provide that the trust should continue for such time as might be necessary to accomplish the purposes for which it was created, if it had not been previously intended that trusts of the character authorized should be limited, not on contingent events, but on lives? Or why specifically authorize the creation of express trusts for the charities enumerated, if that class of trusts had not been affected by the revision of the statutes?

My conclusion is, that trusts of real property, for charitable uses, are not valid in law unless of the description authorized by the statute of 1840, and made to such trustees as are therein authorized to hold. Nor can I say that I arrive at such a conclusion with regret; for trusts are not necessary for public charities; direct grants are always better. This court has not heretofore been called upon to determine whether the provisions of the revised statutes referred to or affected this character of uses and trusts. What we have upon that point is from Assistant Vice Chancellor Sandford, and the superior court of the city of New-York; the former holding that the article of uses and trusts related only to private trusts; the latter, that charitable uses and trusts were affected by it. (*Shotwell* v. *Mott,* 2 *Sand. Ch. R.* 46. *Ayers et al. Ex'rs* v. *Trustees for the Corporation of the Methodist Episcopal Church et al.,* 8 *N. Y. Legal*

*Observer*, 17.) Though entertaining a high respect for the Assistant Vice Chancellor as a learned and accomplished judge, I am compelled on this point to differ from him.

II. The absolute power of alienation of an estate in lands is suspended when there are no persons in being by whom an absolute fee in possession can be conveyed. (1 *R. S.* 723, § 14.) This power of alienation can not be suspended, by any limitation or condition whatever, for a longer period than during the continuance of not more than two lives in being at the creation of the estate. (1 *R. S.* 723 § 15.) The restrictions of the statute are equally applicable to present and to future estates. (16 *Wend.* 128, 163. 14 *Id.* 265.) A similar rule is applied to personal property. The absolute ownership of personal property can not be suspended, by any limitation or condition whatsoever, for a longer period than during the continuance and until the termination of not more than two lives in being at the date of the instrument containing such limitation or condition; or if such instrument be a will, for not more than two lives in being at the death of the testator. (1 *R. S.* 773.) The provision is the same in effect as that relating to real estate; as absolute ownership implies the right of absolute disposal.

The testator's intention as evinced by his will, was that his debts and the legacies specifically given, should be first paid out of the trust property. To effectuate this intent he authorized his trustees to sell his real property, except his estate at Chittenango and its vicinity. The latter estate was to be preserved, unless absolutely required to pay debts and legacies. The object, as he states, which he had in view in the purchase and extension of that property, was the establishment of the Polytechny, and he anxiously hoped that the derangement of his affairs and the extent of his debts might not require its abandonment.

If it should become necessary for the payment of debts and legacies to sell the Chittenango estate or any part thereof, then the ground suitable for village lots should be sold, the trustees giving six months' notice, &c., and as the sale of village lots would always be necessary, as the testator supposed, for the advantage of the place, whether the proceeds were required for the

Yates v. Yates.

payment of the debts or not, the trustees were to continue to sell all that might be required, and when such proceeds were not required to pay debts and legacies, they were to be invested for the support of the Polytechny. There is undoubtedly a valid express trust to pay debts and legacies, and all sales made for that purpose are valid. There is no question however upon this point, as it is conceded; and we are only asked to construe those parts of the will which relate to the disposition of the residue of his estate, after the payment of debts and legacies.

The will provides that if, after winding up and settling the affairs of the testator, the trustees ascertain that there are funds sufficient left to commence and found the school, they are to petition the legislature of this state to accept the devise for the object of endowing and supporting the Polytechny upon the testator's plan; to confirm its permanency by a legislative act, and make the necessary arrangements for its uniform and steady government. If such a law can not be obtained in this state, to the satisfaction of the trustees, then the residue of the testator's estate is to be disposed of, and the money received therefor invested, until the sum of $100,000 be funded, when the trustees are to form the institution in any state a majority of them please to select, which is willing to give the proper irrevocable legal guaranty for its performance, and appropriate not less than 1000 acres of land for the purpose.

The application of the property devised is postponed until the estate of the testator is settled, and it is ascertained that there is sufficient for the establishment of the school, and until the legislature of this state shall have passed a law accepting the devise, and made the necessary arrangements for the government of the school, to the satisfaction of the trustees. Until these conditions are performed, who are capable of conveying the property? Not the trustees, if the trust be valid, and they take the estate; for any act of theirs in contravention of the trust is *absolutely void.* (*R. S.* 730, § 65. 14 *Wend.* 313.) Not the Polytechny; for it is not in existence. Not the state; for it has not accepted the devise. If it be the heirs at law of the testator, the estate must have descended to them for the reason

that the devise is invalid. There is therefore a suspense of the power of alienation for an indefinite term, to wit, from the death of the testator, until the conditions precedent to the application of the residue are performed. Is this suspense legally limited ? There can be no limitation of a term not measured by lives. Lives must be designated, and life must in some form enter into the limitation. (16 *Wend.* 133, 171, 172, 274. 20 *Id.* 506. 9 *Paige,* 521. 1 *Denio,* 57.) Here the suspense is limited by the happening of contingent events. There is a period between the testator's death and the time when an interest is to vest in the Polytechny as a corporation, or in the state as a trustee or devisee, (already fourteen years,) not measured by any designated life or lives in being, but by contingent events. Any possible limitation or condition which *may* suspend the power of alienation for a longer period than two lives in being at the creation of the estate, renders it void. No lives are designated, nor does life in any form enter into the limitation. The will contemplates the application of the fund, after the debts and legacies are paid, and therefore, after the expiration of the trust for that purpose ; but if it may be made during that time, it may also be made, according to the will, after the term has expired. This the law will not permit; the rule being, that by no contingency whatever can the vesting possibly be suspended for any term not measured by lives. The power to sell the land is limited, by the evident intent of the testator, to a sale for the payment of the debts and legacies; and he clearly intended that the bulk of his land at Chittenango should not be sold, if not required for that purpose, but should be retained as the site for the buildings necessary for the school, and for farms at which agricultural knowledge might be practically acquired by the students. But if included in the power, nothing would be gained in favor of the will, because, when the surplus was converted into personal estate, its absolute ownership (which means the right of absolute disposition,) would be suspended by the provisions referred to, for an indefinite term, and the will in that event would be equally invalid as if the surplus remained in land. The most general and comprehensive power of sale and exchange of the particular

property devised, does not render it alienable in the sense of the statute, or of the rules against perpetuities ; those rules referring to the value or *corpus* of the property, whatever form it may assume, and being intended to prevent such value being locked up and excluded from commerce.

The will in this case suspends the power of alienation of the residue of the real estate and the disposition of the personal that may be accumulated by the sale of any part of such realty, for an indefinite term, to wit: from the testator's death until his affairs are wound up, and until it is ascertained that there is sufficient for the establishment of the Polytechny : and further, until the legislature of this state shall have accepted the devise, and made the necessary arrangements for the government of the school, to the satisfaction of the trustees.   This is a limitation unauthorized by law.   The law against the suspense of alienation of real or personal property, is applicable to every species of conveyance and limitation, whether it be by deed or will ; whether it be directly to a party competent to hold property, or indirectly in trust or to the use of such party, or to one hereafter to come into existence ; and whether limited by an executory devise, or a springing use, and whether in the form of a power in trust, or of a legal express trust.   If therefore, it be conceded that there is an express trust, or an executory devise, or a power in trust, with a valid and legitimate object, for charitable uses, and in all other respects unexceptionable ; yet the estate depending on conditions as to the time of vesting which suspend the alienation for a period not measured by a life or two lives in being, it is equally as void as if the object had been illegal.

It is urged that the devise being for a public charity, it does not fall within the restrictions of the statute respecting the creation of perpetuities.   The testator has, by his will, created either a present or future estate in lands.   If he has not, then the lands have descended to his heirs at law.   All estates, by the statute, are void in their creation, if the absolute power of alienation is not limited according to law.   The statute is general and comprehensive ; there are no exceptions.   But as I have before remarked, the mischief to be guarded against was

quite as much to be apprehended through the instrumentality of devises to charitable uses, as in any other way. " It is the very nature of such dispositions," says Lewis, " to withdraw the subject of them from every kind of circulation, since a contrary course defeats their manifest object."

It is urged also, that here was a conditional devise to the state for the purpose specified in the will, and as such it was free from all legal objections. The state is not made either devisee or beneficiary. All the state has to do is to sanction and give the devise effect ; and whatever it may do, if not approved by the trustees, is to be a nullity. But a perpetuity can not be created by a devise to the state, more than to individuals. Nor can the state, as was suggested on the argument, legalize or continue the devise so as to pass it into the hands of a corporation to be created by it *in futuro*. If, as the law existed at the death of the testator, the devise was invalid, and the estate descended to the heirs at law, no subsequent action of the legislature could legally divest them of it.

III. It is perhaps unnecessary that we should specifically inquire whether there is a power in trust in the will, by which the intention of the testator as to the remainder of his estate can be carried into effect ; because upon the assumption that there is a power in trust, it would be subject to the same rules, as to the suspension of the power of alienation, as direct trusts. The real estate reserved for the school would descend to the heirs at law subject to the execution of the power. The testator's property would go to his heirs until the time arrived to establish and endow the Polytechny. Then by the execution of the power, the estate of the heirs would be divested. So long as such a power existed, an absolute fee could not be conveyed. The statute is, that alienation shall not be suspended by any limitation or condition whatever. If it can not be by an express trust or an executory devise, neither can it be by a power in trust. (1 *R. S.* 737, §§ 128, 129. *Hawley* v. *James*, 16 *Wend.* 135, 178. 14 *Wend.* 324.) But it is questionable whether the power contained in the devise is a power in trust at all, either

Yates *v.* Yates.

general or special. There is no person or class of persons designated in whose favor the power can be executed.

I am of the opinion that the trust created by the will of the testator, so far as relates to the residue of his estate after the payment of debts and specific legacies, is invalid, for the reasons, 1st. That the trust created is not authorized by law; 2d. That if it be regarded as an express trust or a power in trust, or an executory devise, the power of alienation is suspended for an indefinite term, not measured by a designated life or two lives in being, but by contingent events. The remainder of the real estate, after the payment of debts and legacies, descends to the heirs at law of the testator, and so much of the personal estate as has been accumulated and invested for the support of the Polytechny, by a sale of the real property at Chittenango, or which is not required for the payment of debts and legacies, passes to his next of kin.

There must be a decree declaring that the trust created by the testator's will, so far as its object is to pay the debts of the testator and the legacies specifically bequeathed, is valid; that the trust in the remainder of the testator's estate, having for its object the endowment and support of the Polytechny, is invalid, not being authorized by law, and suspending the power of alienation of an absolute fee in possession for an indefinite term, without reference to any designated life or two lives in being; that there be a reference to a competent person to take and state the account of the executors, and report thereon to the court, and on the confirmation of such report, that a final decree be entered directing the distribution of the assets in hand, disposing of the shares and rights of the respective defendants in the real and personal estate of the testator, and settling all questions of costs and expenses, and out of what funds to be paid.