# COURT OF APPEALS.

JOHN W. DOWNING and others, appellants agt. JAMES E. MARSHALL and others, respondents.

OPINION of DAVIES, J., reviewing the antecedent English and American authorities, and discussing the law of trusts and powers in trust for religious and charitable uses.

NOTE.—The importance of the questions considered in the following elaborate and masterly opinion, which was omitted in the report of the case when last before the court, (23 N. Y. R., 366,) and the fact that many of them remain open for ultimate decision, have induced the Reporter to comply with the request of various members of the profession, to publish it in a form which will make it acceptable to the bar of the state and the country.

THE provisions of the will of Benjamin Marshall, and the facts material to the discussion, sufficiently appear in the opinion.

DAVIES, J. But two questions have been seriously urged upon our consideration, on this appeal.

The first is, what property is embraced in the devise and bequests contained in the seventh clause of the testator's will, thereby given to the children of his brothers James and Jeremiah. And the second, whether the trust created

in the real estate of the testator by his will for the benefit of the appellants, The Marshall Infirmary, The Bible Society, The Home Missionary Society, and the Tract Society, are valid and can be sustained. We think the true construction of the seventh clause of the will is, that it carries to the children of his brothers James and Jeremiah, therein mentioned, to be divided between them, *per stirpes*, and not *per capita*, all the real and personal estate, in which a life estate had been given by the will to the son of the testator, John Stanton Marshall. By the second clause of the will, the testator gave his dwelling-house, in Congress street, his household furniture and wearing apparel, to his said son during his life, and in case he should die leaving issue, the same should then go to his heirs; and by the third clause of the will, he gave to his executors and trustees, one equal third part of a mortgage therein described, and known as the Walcott mortgage, in trust, to apply the annual income thereof to the support and maintenance of his said son during his natural life, and in case he should die leaving lawful issue, then the same was given to such issue. By the seventh clause of the will the testator, on the death of his said son without lawful issue, devised and bequeathed " all the real and personal estate above devised and bequeathed to him," to the children of his brothers James and Jeremiah, to be divided between them in the same manner and proportions as directed in reference to the bequest to them contained in article third of the will. By reference to that article, it will be seen that the bequest therein referred to was one-third part of the Walcott mortgage, in equal shares to the children of his brother James Marshall, and one equal third part thereof to the children of his brother Jeremiah Marshall, and in case of the death of either or any of said children leaving issue, such child or children to take the share its parents would have been entitled to if living.

John Stanton Marshall died in the lifetime of the testa-

tor, and without lawful issue ; and if there had been no other valid disposition of the property given to him by the will, the personal estate thus given to him would have fallen into the residuary clause of the will, and have passed by it, and the real estate would have descended to the heirs at law.   It was urged by counsel, that the limitation to the children of James and Jeremiah, in the seventh clause, only embraces property devised and bequeathed specifically to John, and not any given to the executors in trust for him.   Strictly speaking, no real or personal estate was devised or bequeathed to him.   By the second clause of the will, the use of the real and personal property therein mentioned was given to him for his life, and by the third clause the annual income of one-third part of the Walcott mortgage was to be applied by the executors to his support and maintenance during his life.   But we think it very clear that the testator, by " all the real and personal estate above devised and bequeathed to his said son," mentioned and referred to in the seventh clause, intended to describe, and did describe, the real and personal estate, the use and income of which had been given to him for his life.   Nothing had been absolutely given to him.   The only real and personal estate therein devised and bequeathed to him was the use of the real and personal estate described in the second clause, and the income of the personal estate referred to in the third clause.   The seventh clause disposes of all the property thus set apart and appropriated to the use of his son John during his life.   It is an independent devise and bequest, and expresses in a clear and intelligent manner the will of the testator, that the beneficiaries named in this clause of the will should take the property therein referred to, in the event that his son John should die without leaving issue.   It was an immaterial fact in the mind of the testator when his son should die.   John was to enjoy the use and income of this property during his life, and at his death the same was to go to his issue, provided he left

any. It was not given as a remainder, but as an independent gift; and as the contingency never arose upon which it was to pass to the son for life, and after his death to his issue, it passed by the seventh clause directly to the children of his brothers therein named. It was the clearly expressed intention of the testator, in the contingency which has happened, that the children of his brothers should enjoy the personal property as well as the real estate set apart and appropriated for the use of his son during his life. Two-third parts of the Walcott mortgage were given to them absolutely in equal shares, and the other third part was appropriated to the support of the son during his life, and on his death to go to his issue, if he left any. The testator would, undoubtedly, judging from the provisions of the will, if he had had no son living at the time he made his will, have made the same disposition of this one-third of this mortgage, which he did of the other two-thirds; and the disposition of the two-thirds indicates his intention in the contingency which has happened, that the remaining one-third should take the same direction.

It is contended, that the son having died before the testator, the legacy or bequest to him has lapsed; but it will be found that this position cannot be maintained as applicable to the present case. In *Taylor* agt. *Wendell*, (4 *Brad. R*,.) the surrogate says : The general rule that by the death of a legatee before the testator, his interest under the will lapses, relates only to the interest of the party so dying, and when there are other interests, grafted or limited upon that of the deceased legatee, they do not necessarily fail. Ordinarily, so long as the event upon which the testator has made his bounty contingent, takes place, it would seem to be indifferent whether it occur in the testator's lifetime or after his death, provided the party designed to be benefited be living. Chancellor WALWORTH, in *Mowatt* agt. *Carow*, (7 *Paige*, 328,) affirming a decree of vice-chancellor

McCoun, adopts the same rule. In that case, the testator gave to his grandson, Elias, one equal fourth part of his estate, but in case he should die before his wife, and leaving lawful issue, then the same was to go to such issue, but if he should die before his wife, leaving no issue, then his share was to be considered as belonging to his (the testator's) estate, and be subject to the division thereof as therein directed. By the will the other portions of the estate were divided into three parts, and disposed of. Elias, the grandson, died in the testator's lifetime, without issue, and unmarried. It was urged that the share of Elias, the grandson, was not lapsed, but was, by the provisions of the will, given over to those who were entitled to the other three-fourths of. the estate, in the same proportions; and the vice-chancellor held that it was a rule of law well settled, that when a devise or bequest to one, with a limitation over to another, if the first should die under twenty-one, or before the happening of any other event; and he dies under the prescribed age, or before such other event happens, though in the lifetime of the testator, yet the devisee or legatee over is entitled. (*Citing* 1 *P. Wms.*, 274; 3*d id.*, 113; *Powell on Dev.*, 202; *Wms. on Ex'rs*, 764.)

These views were affirmed by the chancellor, who says: "It is now clearly settled that where one interest in property is given by will to one person, with a limitation over of the same interest, either to his children or to any other, persons, upon the death of the first devisee or legatee before the time appointed for such interest to vest in possession, the death of the first devisee or legatee, although in the lifetime of the testator, does not produce a lapse of the limitation over of that interest to the substituted object of the testator's bounty." To the same effect is the decision of this court, in *Norris Ex'rs* agt. *Beyea and others*, (3 *Kern.*, 273.) The head note is: Executory gifts, limited to take effect upon the prior legatee dying under age and without issue, are not defeated by the death of the prior

legatee under age and without issue, in the lifetime of the testator, but such gifts take effect immediately upon the death of the testator, as though there had been no preceding limitation.

I propose next to consider whether the several corporations named in the will are competent, under the provisions of our Revised Statutes, to take by devise the real estate of the testator, either by a devise directly to them, or indirectly by the intervention of trustees. In England, from an early period, corporations were, by the mortmain acts, prohibited from holding lands, and they could not, therefore, take and acquire lands ; and the statute of 15 *Rich.* II (*ch.* 5,) declares uses subject to the statutes of mortmain. When the first statute of wills was passed (32 *Hen.* VIII, *ch.* 1,) authorizing the disposition of land by will, corporations were not excepted, and consequently were enabled to take by devise in common with other persons, contrary to the provisions and policy of the statutes of mortmain ; but two years after, parliament, finding the mortmain acts so far repealed by the statute of wills, passed a new statute of wills, (34 *Hen.* VIII, *ch.* 5,) which did not prohibit corporations in terms from taking under the statute of wills. The act was entitled " An act for the explation of the statute of wills," in which is re-enacted the provisions of the first statute of wills, and the exception as to bodies politic and corporate is introduced. This statute did not, therefore, expressly prohibit corporations from taking, but qualified the capacity of the devisee, and limited the power to take by will. The intention manifestly was to rely upon the mortmain laws, to keep property out of the hands of corporations, and to qualify and restrict the statute of wills, so as not to relax the prohibitions secured by those acts.

The statute of wills, enacted for this state, is like that of 34 Henry VIII, ch. 5, and contains the same exception. It was in force until the revision of 1830, and authorized any

person having any estate of inheritance in any lands, to give and devise the same to any person or persons (except bodies politic and corporate) by his last will and testament. (1 *R. S.*, 364, § 1.)  Corporations, therefore, in this state, had no capacity to take lands by devise.   The first case I have found, where the courts of this state passed upon this exception in the statute of wills, is that of *Jackson* agt. *Hammond*, in the supreme court, (2 *Caine's Cases in Error*, 336.) In that case, Israel Smith, by his will, devised to the trustees of the town of Brookhaven, and their successors for ever, upon trust, certain real estate whereof he was seized in fee, to rent the same, and pay the rents and profits thereof to the minister and elders of a Baptist church therein named.   This church became incorporated under the act for the incorporation of religious societies.   At the time of the making of the will, the trustees of Brookhaven were a corporation capable to take and hold lands.   The court held, that the right or power to devise, granted by the statute of wills, being expressly limited, a restricted power extending to a right or power to devise to corporations, the devise in the will of Smith to the trustees of Brookhaven ought to be adjudged void ; and the court also held, that as the act to incorporate religious societies did not authorize them to take lands by devise, the trust created for the benefit of the Baptist church was not authorized by law, and was also void, and the heir at law was adjudged entitled to the lands.

In 1827, the case of *McCartee* agt. *The Orphan Asylum Society*, was heard by the then chancellor, JONES, and in the same year was heard on appeal in the court of errors. Philip Jacobs, being seized of a large real estate in the city of New York, devised the same to his executors in trust, if there should be any child of his living at the time of his death, to apply the rents and profits thereof to the support and maintenance of such child, and the surplus to be paid over to the child on its attaining the age of twenty-

one years. He devised and bequeathed all the residue of his real and personal estate to the Orphan Asylum Society, the bequest to take effect immediately after his decease if he left no child, and then gave all his real estate upon the trusts aforesaid. The testator had a posthumous child, which lived but about two years. The act of incorporation of the Orphan Asylum (30th Sess. L., p. 508, § 1,) declared that it "should be capable in law, of purchasing, holding and conveying any estate, real or personal, for the use of said corporation, provided such estate should not exceed in value one hundred thousand dollars." The chancellor held, that if the devise should be construed as made directly to the corporation, it was competent to take the real estate, notwithstanding the exception in the statute of wills, for the reason that as the Society was made capable of purchasing, holding and conveying any estate, real or personal, for the use of the corporation, it could take the same by will. He also held, that the true construction of the will was, that the real estate was not devised directly to the corporation, but given to the executors in trust for the benefit of the corporation, and that, although the corporation could not, by reason of the exception in the statute of wills, take directly real estate by devise, this did not prevent their taking the use of real estate, and that consequently the title to real estate might by devise be vested in another for the benefit of a corporation. And he also held, that if for any reason the devise should fail altogether, yet as the testator had charged his real estate with a charitable use or trust, it descended to the heir at law thus charged, and the court of chancery, by virtue of its inherent jurisdiction, would compel the heir to execute the trust. The court of errors reversed the decree of the chancellor, holding that the devise was direct to the corporation, and that, by the exception in the statute of wills, it had no capacity to take real estate by devise. And secondly, that the authority to purchase, hold and convey real

estate, in no sense weakened or impaired the disability created by the statute of wills. It was said that such a clause cannot be intended to overleap the positive restriction found in the statute of wills. If our statute of wills, therefore, stood now as it did prior to 1830, then corporations would have been incompetent to take by devise the real estate of this testator, if the devise had been made directly to them.

We are next to inquire, whether they are now competent to take the use of lands where a trustee has been interposed in whom the legal estate is vested. If we look a moment at the reason of the exception in the statute, we shall see that the evils intended to be remedied by it, would fail to be reached, if we allowed such an evasion of the statute. By the statutes of mortmain, as we have observed, corporations could not hold lands. To evade their force, uses were invented, and the statute of 15 Richard II was then passed, prohibiting the enfeoffment of lands to the use of a corporation. The statute of wills as amended in 34 Henry VIII, contained the exception in reference to bodies politic and corporate, so that by the instrumentality of that statute the principles of the statutes of mortmain should not be subverted. But so solicitous were the English courts to uphold the system of charitable uses, that they held as in *Paten's case* (1 *Coke's Rep.*, 22) decided, when the statutes of 32 and 34 Henry VIII were in force, that a devise to executors upon trust to convey to a corporation, would have been valid, because it might lawfully be done by a license; and as in the case of *McCartee* agt. *Orphan Asylum*, there was such a license, by the act of incorporation the trust was valid, and would be enforced for the benefit of the *cestui que trust*. STEBBINS, senator, who delivered an opinion in the court of errors, in the last mentioned case, in favor of sustaining the decree of the chancellor, says it might be perhaps conceded that if corporations were *prohibited* by statute from taking the fee by devise,

Downing agt. Marshall.

(which, he says, is not the case,) the law would not allow them to take the use. He says the statute of wills is an enabling statute, and not prohibitory. Before this statute individuals had no capacity to devise lands, but this enabled them to do so, except to corporations. In conferring the capacity to devise, the legislature withheld the power to devise to a corporation ; and that the intention seems to have been to rely upon the mortmain laws to keep property from corporations, and to qualify the statute of wills, so as not to interfere with those prohibitory acts. The senator then adds : " The difference is a wide one between an incapacity to devise, and a prohibition against taking ; for although there may be an incapacity to devise directly to a corporation, yet such incapacity will not prevent the corporation from taking by grant from the devise in trust, if there is no prohibition against their taking. So too, there may be an incapacity to devise *lands* to a corporation, and yet the corporation may take a use. But in either case, if prohibited from taking, the law would not probably allow to be indirectly done that which was directly prohibited."

The decision in this cause and the discussion had therein, led, I am quite confident, to the prohibitory character of the section of the Revised Statutes relating to wills, reported about this time to the legislature by the revisers. That section, as reported by them, was adopted precisely as drawn by them, and is now found in the Revised Statutes (*vol*. 3*d*, 5*th* ed., *p*. 138, § 3.) Sections one and two authorize all persons to devise their real estate by a last will and testament, and declare that any estate and interest in real property may be so devised ; and section third is in these words : " Such devise may be made to every person capable by law of holding real estate ; but no devise to a corporation shall be valid unless such corporation be expressly authorized by its charter or by statute to take by devise." The revisers, in their note to this section, say :

" It has been put into the form of a positive prohibition, with the view of calling the attention of the legislature to it, that it may be retained if it is intended to be *prohibitory*, or may be expunged if it is deemed unnecessary. It is a question *now* agitated in our courts, whether it is to be considered as a prohibition or not." The legislature retained the section as drawn up by the revisers, and we must understand that it was so retained for the purpose of rendering a devise to a corporation, of real estate, prohibitory. This view is confirmed by the fact, that one branch of the legislature, to whom this section was reported and by whom it was adopted, was the senate of the state, comprising almost entirely the court of errors, which at the time had before it for decision the case of *McCartee* agt. *The Orphan Asylum*, and did decide it while this section was under consideration. I assume, therefore, that it is the settled law of this state, that corporations are prohibited from taking real estate by devise, unless expressly authorized by their charters or other statute laws to take, and that this prohibition extends not only to a devise of the fee of such lands, but the devise of the use of them. Whatever they cannot take directly, they are equally prohibited from taking indirectly.

It remains to be seen if either the corporations or societies named in the testator's will is authorized by its charter or by statute to take by devise. The Home Missionary Society is unincorporated, and therefore incompetent to take or acquire real estate by devise. The charter of The American Bible Society, (*Laws of* 1841, *p.* 41,) and the charter of The American Tract Society, (*Laws of* 1841, *p.* 249,) do not authorize either of these societies to take real estate by devise, and the charter of The Marshall Infirmary, (*Laws of* 1851, *p.* 537,) does not expressly authorize that corporation to take real estate by devise. The provision is, that the corporation " shall be capable of taking by direct purchase or otherwise, holding, conveying, or other-

wise disposing of any real or personal estate for the purpose of the incorporation." We look in vain in this language, for an *express* authority to take by devise. The statute defining the general powers, privileges and liabilities of corporations (2 *R. S.*, *5th ed.*, § 1, 596) does not authorize these corporations to take real estate by devise. If, therefore, the real estate of the testator has been devised directly or indirectly to these corporations, for the uses and purposes for which they are severally incorporated or organized, being of a religious and charitable nature, such devise being expressly prohibited by statute, the devise must fail for want of a competent trustee to take. (*Owens* agt. *Missionary Society*, 4 *Kern.*, 380.) This case also holds that there being no competent trustee to take named, our court of chancery or supreme court, as now organized, has not jurisdiction to uphold a void devise, on the ground that it is for a religious or charitable purpose. It follows, therefore, if these views are sound, that this devise of real estate, whether regarded as made directly to these corporations, or indirectly to them, both alike being prohibited, is invalid and cannot be sustained.

It is, however, urged on behalf of the appellants, that the trustees named in the will are competent to take the estate in the land devised, and that the trusts created in favor of the appellants, being for charitable and religious purposes, will be sustained on that ground. It is contended that our statutes of uses and trusts have no application to trusts of this character, and that notwithstanding these it is still competent to create trusts in real estate for charitable and religious purposes. We have to meet the question which I understand this court has never yet passed upon, whether since the adoption of the Revised Statutes, trusts in lands in this state can be created for any other purpose than such as is authorized by them. The revisers in submitting article 2d, chapter 1, part 2d of the Revised Statutes, say, that the modified abolition of uses and trusts

HARVARD LAW SCHOOL LIBRARY

which was proposed in that article, is doubtless an exten-
sive, and may perhaps be viewed by some as an alarming
innovation; and that every plan to reform and simplify
the.law of real property which shall not contain substan-
tially the change now recommended, will be found imper-
fect and in a great measure ineffectual.   And in their note
to section 55 of the statutes, they say, " that after much
reflection the revisers have not been able to satisfy them-
selves that there are any cases not enumerated in this sec-
tion, in which, in order to secure the execution of the trust,
it is necessary that the title or possession should vest in
the trustees."   The section of the Revised Statutes as
drawn by the revisers and as adopted by the legislature,
is in these words : " Uses and trusts, except as authorized
and modified in this article, are abolished, and every estate
and interest in lands shall be deemed a legal right, cogni-
zable as such in the courts of law, except when otherwise
provided in this chapter."   (3 *R. S.*, *5th ed.*, *p.* 15, § 45.)
And the 46th section is, " Every estate which is now held
as an *use*, executed under any former statute of this.state, is
confirmed as a legal estate."   And section 55 (*p.* 16,) autho-
rizes express trusts to be created for any or either of the
following purposes :

1. To sell lands for the benefit of creditors.

2. To sell, mortgage or lease lands for the benefit of
legatees, or for the purpose of satisfying any charge thereon.

3. To receive the rents and profits of lands and apply
them to the use of any person during the life of such per-
son, or for any shorter term, subject to the rules prescribed
in the first article of that title.

4. To receive the rents and profits of lands, and to accu-
mulate the same, for the purposes and within the limits
prescribed in the first article of that title.

These provisions do not embrace a trust for a charity,
and necessarily exclude such as in the English law are
regarded as for a charitable purpose.   Can this devise be

sustained because the estate is given to trustees competent to take, in trust to pay over the income thereof for a limited period, and then distribute the same to the said socie-ties or corporations for the uses and purposes of their organization ? It is not contended, in view of the provisions of our statutes, that this can be done upon any other ground than that such uses and purposes are charitable and religious, and therefore it is said the sweeping and condemnatory language of the statute, in reference to uses and trusts, has no bearing on trusts of this character. We have seen that uses and trusts, except as authorized and modified in the section of the statutes quoted, are abolished. The language used is comprehensive and unequivocal. If we desire to see what uses and trusts are retained and permitted, we must look to the subsequent provisions of the article. All not so retained are abolished. This language, to my mind, clearly conveys the idea that something existing was to be blotted out. Some uses and trusts theretofore known and recognized, unless authorized by that article, were thenceforth to have no existence or legal validity.

We have already seen for what purposes express trusts in lands may be created. And if we respect the language used by the legislature, it follows conclusively that no other trusts in lands than those enumerated, can have legality. I apprehend that we are not at liberty to speculate as to the meaning or intention of the legislature, in a case like this where the language used is so clear and unmistakable. I refer, as conclusive on this point, to the remarks of JOHNSON, J., in this court, in *Newell* agt. *The People*, (3 *Seld.*, 97,) and the authorities cited by him. He says, in considering a statute with a view to its interpretation, the thing we are to seek is the thought which it expresses. To ascertain this, the first resort in all cases is to the natural signification of the words employed. If thus regarded, the words embody a definite meaning, which

involves no absurdity and no contradiction between the different parts of the same writing; then that meaning, apparent upon the face of the instrument, is the one which alone we are at liberty to say was intended to be conveyed. In such a case there is no room for construction. That which the words declare is the meaning of the instrument, and neither the courts nor the legislatures have the right to add to or take away from that meaning.

Chief Justice MARSHALL, in *Ogden* agt. *Gibbons*, (9 *Wheat.*, 188,) lays down the rule in clear and emphatic language. He says : " As men, whose intentions require no conceal-ment, generally employ the words which most directly and aptly express the ideas they intend to convey, the enlight-ened patriots who framed our constitution, and the people who adopted it, must be understood *to have employed the words in their natural sense, and to have intended what they said.*"

We are bound to assume, therefore, in examining these provisions of the Revised Statutes, that the revisers, in framing them, well understood the force of the language employed by them, and that they and the legislature under-stood the words used in their natural sense; and we are bound to act on the belief that they intended what they have said. I yield my hearty assent to the eloquent and forcible remarks of a late eminent judge of this court, who, on the construction of that clause in the former constitu-tion of this state which required the assent of two-thirds of the members of the legislature to every bill " creating, continuing, altering or renewing any body politic or cor-porate," when it was attempted to exempt municipal cor-porations from these provisions, said : " These words are as broad in their signification as any which could have been selected for the occasion from our vocabulary, and there is not a syllable in the whole instrument tending in the slightest degree to limit or qualify the universality of the language. If the clause can be so construed that it

*Downing agt. Marshall.*

shall not extend alike to all corporations, whether public or private, it may then, I think, be set down as an established fact, that the English language is too poor for the framing of fundamental laws which shall limit the powers of the legislative branch of the government." " In this way a solemn instrument—for so I think the constitution should be considered—is made to mean one thing by one man, and some thing else by another, until in the end it is in danger of being rendered a mere dead letter, and that, too, when the language is so plain and .explicit, that it is impossible to make it mean more than one thing, unless we first lose sight of the instrument itself, and allow ourselves to roam at large in the boundless field of speculation. *For one I dare not venture on such a course.*" (*Per* BRONSON, J., *People* agt. *Purdy*, 2 *Hill*, 36.)

In the same case, in 4th *Hill*, (*p.* 398,) in the court of errors, PAIGE, senator, said : " I trust that in reference to the present case, this court will not hesitate to array itself in favor of the old and revered doctrine of strict construction—the only safe and sound doctrine for the governance of either judges or legislators. If courts are allowed to depart from it, and venture upon the perilous experiment of substituting, for the clear language of the instrument, their own notions of what it ought to have been or what its framers intended, there will be an end of written constitutions and of all attempts to fix limits to legislative or judicial power."

If we adhere to these sound and conservative views, we shall have no difficulty in ascertaining what the legislature intended when they said uses and trusts, except as authorized and modified in this article, are abolished. We must hold they intended just what they have said ; and it is an unwarranted stretch of judicial power to substitute for their language, so plain, clear and unmistakable, our own speculations or notions of what they ought to have said, or what we think they intended to have said. For one, I dare

not venture to do so. My path of duty seems plain, to fol-
low where the unmistakable language of the legislature
leads me ; and this appears to me to be a safer rule than
to speculate as to the meaning and intention of legisla-
tures, unsupported by and even unconnected with their
language. If the latter shall have been misunderstood, an
annual corrective is at hand, and can always be invoked in
a recurrence to the legislative power.

We were strongly pressed, on the argument of this case,
to adhere to the rule of *stare decisis*, and the evils of depart-
ing from it were glowingly and truthfully depicted. If the
question now under consideration had been presented for
decision, and been decided by this court, I should yield
without a murmur to the result, whatever might have been
my own convictions upon the question. But I think it can
be clearly shown that this court has not in any case held
that a trust in land, since the passage of the Revised Code,
can be created for purposes other than those authorized
by it. It was urged that *Williams* agt. *Williams*, (4 *Seld.*,
525,) had so ruled, and that we ought to re-affirm the doc-
trine of that case. It was said by the learned judge of this
court who delivered the opinion in that case, in answer to
the argument that the legacy in that case was illegal as
creating a perpetuity, contrary to the provisions of the
Revised Statutes, that it was unquestionable that the gen-
eral object, and one of the essential terms of the gift, re-
quires that the funds should be perpetually vested in the
corporation, and the income only expended by the trus-
tees ; and he said he was free to admit, that the power to
call in and re-invest, by which the specific funds would be
frequently alienated, would not relieve it from the imputa-
tion of an illegal perpetuity, if the gift had been to trus-
tees for private uses or to carry out family arrangements.
But, he said, if by a fair construction of the act concerning
religious corporations, it can be shown that corporations
organized under its provisions were, before the Revised

Statutes, authorized to hold real and personal estate in perpetuity, contrary to the general principles of law, it cannot, he thinks, be successfully maintained that the power is taken away by the Revised Code. It is conceded here, that the holding of real and personal estate by a corporation in perpetuity, is contrary to the general principles of law, and the *onus* is therefore thrown upon those who desire to maintain the right of corporations to take and hold real or personal property, to show the special authority of the legislature granting the power. The learned judge then proceeded to show why the act for the incorporation of religious societies had not been affected by the Revised Statutes, in reference to perpetuities, and he arrived at the conclusion that the corporation named, being a religious corporation, and deriving its powers from the act for incorporating societies of that character, was competent to take the legacy for the uses and purposes of its incorporation. It is correctly and pointedly stated in the opinion, that the legacy in that case was of personal property only, and was therefore unembarrassed by some of the difficulties which might attend such dispositions of real estate.

I am greatly at a loss to find any reasonable pretext for the position that this case holds the doctrine that a trust in real estate can be created in favor of a corporation for a charitable purpose. The case did not relate to real estate; the point assumed to have been decided was not in the case, and was not passed upon, but was expressly disclaimed. It is true, that in the opinion it is said that in the judgment of the author the provisions of the Revised Statutes respecting trusts, perpetuities and the limitation of future estates, were devised to restrain the natural propensity of mankind to perpetuate their estates in their families and among the descendants of themselves and their relatives and friends; a propensity which the laws of the mother country have allowed to an extent which could not

be tolerated in a purely representative government, where a degree of equality in social condition is indispensable. And he thinks those provisions were not designed to, and do not at all affect conveyances or testamentary gifts to religious or charitable corporations. It is seen that this is but the opinion of the learned judge, and not that of the court. And to whatever authority it is entitled, as coming from so distinguished a source, (and no one holds it in higher estimation than myself,) it is but the opinion of the learned judge himself, and not that of the court. We are at liberty, therefore, to hold that it is not a binding authority upon us; and if the reasons given for the views expressed fail to convince our judgments, we are not embarrassed by their expression. I quite concur that these provisions of the statutes were devised for the purpose of restraining the evils so truthfully depicted, but great as they were, they are of far less magnitude than the adoption of a system which will inevitably withdraw from commerce, and render inalienable, a large portion of the real estate of the state. If the courts in this state will adhere with the same fidelity to the provisions of the statute abolishing uses and trusts, and to the prohibition upon corporations taking lands by devise, that the English judges have in supporting parliament in the adoption of the mortmain act and enforcing its provisions, we shall not see here the state of things once prevailing there.

I think the reasons given by Justices STRONG and EMOTT, in *McCaughal* agt. *Ryan*, (27 *Barb.*, 285–292,) show conclusively that *Williams* agt. *Williams* did not decide that trusts of real estate could be created for purposes other than those authorized by the statutes. At the same term at which *Williams* agt. *Williams* was decided, the case of *Tucker* agt. *St. Clement's Church* was also decided, and it is claimed that that case is an authority for the appellants' position. That case is our authority for holding that *a conveyance* of real estate to a religious corporation, authorized

by its charter to take and hold real estate for the purposes of its organization, was valid and could be sustained. The estate was conveyed to the church upon the trust that the rents, issues and profits thereof were to be appropriated for the support of the rector. No opinion was given in this court on the affirmance of the judgment of the superior court of New York. The case in that court is reported in 3 *Sand. S. C. R.*, (242,) and that court held that the real estate was granted to the corporation in trust for a use or purpose comprehended in the general object of its incorporation, and which, by its charter, it was authorized to take, and therefore it was a legal and valid grant. It is therefore believed with great confidence, that neither of these cases assumed to decide, or did in fact decide, that a devise of lands to trustees in trust for a purpose or object not defined or authorized by the Revised Statutes, could legally be made since the adoption of the Revised Code. Uses and trusts, except as authorized by that article, as we have seen, were abolished. They were thereafter inhibited, and rendered incapable of creation. If the statute had read, all uses and trusts, it could not have been more emphatic ; and applying the rules of construction to this statute which have received the sanction of this court, and have already been adverted to, there would seem to be no reasonable doubt on the subject, or any tenable ground upon which an opposite argument can be reared.

In the case of *Shotwell* agt. *Mott*, (2 *Sand. Ch. R.*, 46,) vice-chancellor SANDFORD advances the opinion that the Revised Statutes have no application to charitable uses and trusts. He says : " That it was not the intention that they should affect those trusts, clearly appears by the notes of the revisers accompanying this article, when it was submitted to the legislature. They proposed sweeping and radical changes in the existing law of uses and trusts, and state their reasons and objects fully and elaborately. But there is not one word upon the subject of charitable uses. They

were treating wholly of private uses and trusts; of those intricacies and refinements in the dealings of individuals with real property, which have perplexed conveyancers and filled the courts with litigation. They proposed to cut up this class of estates by the roots, and the legislature adopted their suggestions and destroyed it most effectually." He says, however, that the gift in that case was not of land but of money—that it was literally a bequest of personal property. The remarks of the learned vice-chancellor in reference to the trusts authorized by the statutes in lands, had no application whatever to the case then under consideration, and were therefore mere *obiter dicta*. I have quoted them thus fully, as they are the views of the only judge in this state, with one exception hereafter noticed, that has fallen under my observation, who maintains thus broadly the total inapplicability of the provisions of the Revised Statutes to trusts in lands, where the trusts are created for a religious or charitable purpose.

The next case, where the subject now under discussion was considered, is that of *Ayres* agt. *The Methodist Church, &c.*, (3 *Sand. S. C. R.*, 351.) The devise there was to the trustees of the Methodist church, of certain real estate in trust, to receive the rents and profits thereof, and apply the same to the support and maintenance of one or more moral, worthy persons, of the age of sixty years and upwards. The opinion of the court was delivered by DUER, J., who had previously rendered the opinion in the case of *Tucker* agt. *St. Clement's Church*, and it contains a masterly review of the state of the law at the time of the repeal, in this state, of the statute of Elizabeth and the mortmain acts. He demonstrates conclusively, to my mind, that by such repeal, it was never intended to revive the clerical doctrine of pious and charitable uses as it prevailed in England before the reformation, and during the prevalence of which, as Lord HARDWICKE says, (1 *Vesey*, 224,) the

Downing agt. Marshall.

clergy and religious houses had continued to possess themselves of nearly one-half of the whole of the real property of the kingdom, and he wonders they did not get the rest, as people thought they thereby purchased heaven. Judge DUER says : " We cannot suppose that the legislature meant to condemn and reject the policy upon which the statutes of mortmain are founded, a policy which the most enlightened statesmen and jurists have constantly approved, and the observance of which the very nature of our institutions seems to demand. This policy, so far from having been abandoned, had been strictly adhered to and followed in retaining the prohibition to corporations to take by devise, and in limiting the amount of the property that religious corporations are permitted to hold. The object of these provisions is exactly the same as that of the statutes of mortmain, namely, to prevent real property from being locked up in perpetuity, and to save persons, *in extremis,* from being led by false motives of merit or duty so to dispose of their estates as to impoverish, perhaps to leave in actual destitution, their families or dependent relatives. (4 *Kent's Com.,* 507.) The same policy has been constantly adhered to by the course of legislation in this state, and has found expression in the general act to incorporate benevolent, charitable, scientific and missionary societies, passed April 12, 1848. (*Laws of* 1848, *p.* 447.) It is found in the sixth section of that act, which is as follows : "Any corporation formed under this act shall be capable of taking, holding or receiving any property, real or personal, by virtue of any devise or bequest contained in any last will or testament of any person whatsoever, the clear annual income of which devise or bequest shall not exceed the sum of ten thousand dollars, provided no person leaving a wife or child or parents shall devise or bequeath to such institution or corporation more than one-fourth of his or her estate, after the payment of his or her debts ; and such devise or bequest shall be valid to the extent of such

one-fourth. And no such devise or bequest shall be valid in any will which shall not have been made and executed at least two months before the death of the testator."

Judge WILLARD, in his Treatise on Equity Jurisprudence, says that this provision was made to guard against improvident testamentary dispositions of property by persons *in extremis*, in derogation of the claims of near relatives. (*Willard's Eq. Juris.*, *p.* 576.) It cannot fail to be seen, that if we hold that testators may evade this statute, by giving by will their lands to trustees for the benefit of corporations, we entirely circumvent the benign intentions of the legislature, and effectually defeat the objects sought to be attained by the legislature. We permit to be done indirectly what the legislature have prohibited in the most positive and direct terms. To permit a trust to be created, as is sought to be done in this case, the object of the statute is utterly thwarted.

Mr. Justice DUER, in the case of *Ayres*, (*supra*,) also says " that as charitable uses are most plainly and directly repugnant to the statutory provisions in relation to trusts and perpetuities, they are now to be considered as positively forbidden, and therefore abolished." He further says, and I quote at length, as the source from which the remarks originate give to them peculiar weight and authority, " that they" (charitable uses) " are embraced within the terms of these statutory provisions ; terms as explicit, as strong and as comprehensive as the language can furnish, it is impossible to deny, and we yet remain to be convinced that they are not just as certainly embraced within their spirit and policy. At any rate, to declare that they are not, and upon that ground to introduce an exception which there is not the slightest evidence was ever contemplated by the revisers or by the legislature, would seem to us, as at present advised, an unjustifiable if not unexampled stretch of judicial power. It is said (referring, doubtless, to the opinion of vice-chancellor SANDFORD in *Mott* agt.

*Shotwell, supra,*) that the revisers in their notes make no reference or allusion to charitable uses, and it is assumed that they would not have been silent had they meant to abolish them; but it seems far more reasonable to say, that had they meant to except them from the universal terms of the enactment which they proposed, they would certainly have done so, since, had such been their intention, the necessity of a positive exception, in order to prevent misconstruction, could not possibly have escaped them; on the other hand, if they meant not to except but to include charitable uses, the explanation of their silence is easy and obvious. They may have deemed it unnecessary to speak; they may have thought that the provisions which they recommended spoke for themselves in a language that neither the legislature nor judges could fail to understand. The article in relation to uses and trusts commences with this declaration : ' Uses and trusts, except as authorized and modified in this article, are abolished.' And the addition of a note, telling the legislature that all uses and trusts not excepted were meant to be included, would have been an idle repetition of the text, which, if words have a meaning, could have no other interpretation."

This is the emphatic language of one of the revisers, and, as it is generally understood, of the author and framer of this article of the statutes. It was stated on the argument of this cause, by the learned counsel for the respondents, (Mr. PORTER,) that he was present at the argument of the case of *Yates* agt. *Yates,* (9 *Barb.,* 324 ;) that Mr. J. C. SPENCER, also one of the revisers, and of counsel in that cause, stated that he entirely concurred in the views expressed by Mr. Justice DUER in the case of *Ayres* agt. *The Methodist Church,* as to the construction put by him upon the statute abolishing uses and trusts, and the intentions of the revisers in preparing and submitting that statute to the legislature. Mr. Spencer at the same time read a letter from Mr. BENJAMIN F. BUTLER, the other reviser, expressing

his concurrence in the same views. We have thus the united testimony of the three revisers, gentlemen of the highest position in the profession, that in preparing this article of the statutes, it was their intention, and which intention they thought they had given expression to clearly and unmistakably, as they have declared, to insure the abolition of all uses and trusts, except as authorized and modified therein; and it is quite reasonable, in view of the language employed, to infer that the legislature, in adopting the article submitted, were governed by a like intent.

The point now under consideration is most ably and satisfactorily discussed by WRIGHT, J., in *Yates* agt. *Yates,* (*supra.*) It would seem to be a work of supererogation to attempt to add anything to the powerful and conclusive reasoning of that opinion. That case was decided in the general term of the third district, and the views then enunciated have been since adhered to in that district, and doubtless formed the rule of decision in the present case. To the same effect is the decision of the general term of the fourth district, in *Voorhies* agt. *Pres. Church of Amsterdam,* (17 *Barb.,* 103,) and which has ever since, as it is understood, been the doctrine of the supreme court of that district. HAND, J., in his opinion, concurred in by Justices CADY and C. L. ALLEN, says: " The statute of uses and trusts is express, positive and distinct, and abolishes every use and trust except as authorized and modified by the same article." The opinions of WRIGHT, J., in *Yates* agt. *Yates,* and DUER, J., in *Ayres* agt. *Methodist Church,* on this point, are very able, and show that there is no qualification or exception, express or implied, in favor of public trusts or charitable uses. No stronger or broader language could well be used than that " uses and trusts, except as authorized and modified in this article, are abolished; any specification or enumeration would almost necessarily have weakened its effect." The same subject has received a full and critical review in *McCaughal* agt. *Ryan,* (27 *Barb.,*

376.) I am unable to add anything to the learned opinions of Justices STRONG and EMOTT, and both of those eminent judges arrive at the clear and decided conclusion, that trusts in real estate for pious and charitable uses are not sanctioned, but on the contrary are absolutely prohibited by the provisions of the Revised Statutes relative to uses and trusts. *King* agt. *Randle*, (15 *Barb.*, 139,) is to the same point.

COWEN, J., in his opinion in *Kane* agt. *Gott*, (24 *Wend.*, 664,) clearly holds that the provisions of the Revised Statutes, now under consideration, abolish all trusts in real estate, except as therein authorized, including charitable trusts. The same doctrine is affirmed by Chancellor WALWORTH in *Potter* agt. *Chapin*, (6 *Paige*, 650,) where he says that the court of chancery will sustain and protect a dedication of personal property to public or charitable uses, provided the same is consistent with local laws and public policy, when the object of the gift or dedication is specific and capable of being carried into effect according to the intention of the donor. That a devise or conveyance of real estate, under the provisions of the Revised Statutes, might perhaps form an exception to the general principle, as a devise of real estate can only be made to a person capable of holding the same for the purposes of the charity, and all general trusts are abolished. As authority for the position that a devise of real estate can only be made to a person capable of holding for the purposes of the charity, he cites 2d Revised Statutes, (*1st ed., p.* 57, § 3,) which declares that no devise to a corporation shall be valid, unless expressly authorized by its charter or by statute to take by devise; and for the last position, section 49, (1 *R. S., 1st ed., p.* 728,) which enacts that every disposition of lands, whether by deed or devise, thereafter made, shall be directly to the person in whom the right to the possession and profits shall be intended to be invested, and not to any other to the use of or in trust for such person; and

if made to one or more persons to the use of or in trust for another, no estate or interest, legal or equitable, shall vest in the trustee; and section 62, (*p.* 729,) which declares that where an express trust is created, every estate and interest not embraced in the trust and not otherwise disposed of, shall remain in or revert to the person creating the trust, as a legal estate.

In the case of *Boyce* agt. *The City of St. Louis*, (29 *Barb.*, 657,) Mr. Justice SUTHERLAND expresses his dissent to that portion of the opinion in the case of *Beekman* agt. *The People*, (27 *Barb.*, 272,) which held that the statutes of this state abolishing uses and trusts, except as therein authorized, prohibited the creation of trusts in real estate for charitable purposes, trusts of that character not being authorized by the Revised Statutes. This opinion, and that of vice-chancellor SANDFORD, and some views expressed by assistant vice-chancellor HOFFMAN, in *Wright agt. Trustees of Methodist Church*, (*Hoff. Ch. Rep.*, *p.* 202,) are the only additional authority or dicta which I have been able to find in this state, holding that trusts in real estate for charitable purposes, since the enactment of the Revised Statutes, may be created. The whole current of judicial authority in this state, as I understand it, with these exceptions, holds the opposite doctrine; and I think the views expressed in those opinions which have been referred to, are maintained with such an array of authority, research and learning, as to commend them to our approval, and with a force of reasoning which cannot be overthrown.

I have met with two cases which seem to me quite decisive of the views already expressed, and fully sustain the doctrine enunciated, that trusts for charitable objects are not to be exempted from the sweeping language of our Revised Statutes. The case of *Donations* agt. *Wybrants*, (2 *Jones & La Touche Rep.*, 182,) was decided by Lord Chancellor SUGDEN, in Ireland, in 1845. The statute of 3 and 4 Will. IV, (*ch.* 27,) was held in this case to be a bar to a

Downing agt: Marshall. ,

suit in aid of a charity. The Lord Chancellor said the statute was a bar to all legal rights, and does not contain any saving clause in favor of charities. By it no person was to make any entry or distress, except within the period therein specified, and this word "person," it was held, extended to a body politic, corporate or collegiate, and to a class of creditors or other persons, as well as an individual. He further said : "The new statute no longer left courts of equity to act by analogy, but expressly enacted that no person claiming any land or rent in equity, should bring any suit to recover the same but within the period during which, by virtue of the provisions of the act, he might have made an entry or distress, or brought an action to recover the same, if he had been entitled at law to such estate, right or interest in or to the same, as he shall claim in equity. This, therefore, is quite as imperative as the enactments binding legal estates. No person can bring any suit within the legal limitation. This leaves to equity no discretion. * * * Now it appears to me, that unless the case can be brought within this saving (that of the 25th section) which operates between trustee and *cestui que trust*, it would fall within the general prohibition of section twenty-four. For charities were only saved in equity from the operation of former statutes, *as trusts*, although highly favored ones, and now *all trusts* are barred by section twenty-four, unless saved by twenty-five, *and I am not at liberty to introduce an exception into the act which the legislature, providing generally for all trusts, have not thought it proper to enact.*"

The same question was before the House of Lords in the case of *Magdelen College, Oxford* agt. *The Attorney-General,* (6 *House of Lords Cases, p.* 189.) The head note to the case is, "Charities are trusts, and are as such within the operation of 3 and 4 Will. IV, (*ch.* 27.") This case was decided in 1857, and the Lord Chancellor, in giving the opinion, says : "With respect, however, to that particular

species of trust which had charity for its object, courts of equity did not follow the analogy of the statutes. The grounds of distinction were, that laches cannot be imputed in cases of charity, and perhaps, also, there was a leaning towards such a mode of applying property, and this feeling might likewise operate that the parties most interested are generally least able to assert their rights. These, I presume, were the principles on which the courts acted in refusing to consider the statutes of limitations as a guide, even by way of analogy, when they were dealing with charity estates. I must, however, remark, that from my experience I have come to the conclusion that this practice has frequently led to great hardships, and that in attempting to be just towards certain classes, such as the poor, the consequence often was that there was great injustice done to the classes above them. The question now is, what has been the effect of the late statute ? Are charities within those two sections, 24 and 25, or are they not ? I have come to the conclusion that they are. Those sections in terms apply to all trusts. Charities are trusts; a favored sort of trust, no doubt; but still a charity is a trust, and nothing more. Lord St. Leonards remarked truly, that charities, *eo nomine*, are not mentioned in the statute, and expressed his surprise that that omission had occurred; but that is not material, *for trusts generally are mentioned, and that includes charitable trusts unless they are expressly excepted, and there is no exception.*"

Baron Mensleydale said : " This subject was under the consideration of Lord St. Leonards, when lord chancellor of Ireland, in several cases cited at your Lordship's bar, and he finally pronounced his opinion in the case of the *Commissioners of Charitable Donations* agt. *Weybrants*, that the 24th section of the statute barred charitable trusts unless the 25th section took the particular case out of its operation. I entirely concur in that opinion, and have

reason to believe, from personal communication, that his Lordship has no doubt as to the propriety of that decision."

The authority is therefore clear and conclusive, that if a similar question were now to arise in the English courts, it would be ruled precisely as it was by the supreme court of this state in the case of *Yates* agt. *Yates*, and the other cases decided in harmony with it.

But it is argued, that the law regards with such favor all trusts for charitable purposes, that it is to be presumed that the legislature, in the general language used, did not intend to embrace trusts of that character, and that the courts should not include within the terms of the act what the legislature has omitted. If the language of the statute was doubtful, we might then properly resort to the surrounding circumstances for its interpetration, and might be at liberty to adopt such a conclusion; but it is believed that it has already been shown, that there is no ambiguity in that used, and that in such a case, upon well settled principles, we must assume the legislature intended to say what they have said.

This argument mainly derives its force from the example of the English judges, in sustaining devises for charitable purposes made to corporations, notwithstanding such corporations were excepted from the statute of wills of 34 Henry VIII, (*ch.* 5.) This statute, by declaring the incapacity of both devisor and devisee, renders every devise to a corporation void, whatever its intent or object. There is no saving clause in the statute in favor of a devise to a charity, and yet a devise to a corporation for a charitable use, it has been frequently decided in England, was not within the statute. A similar rule was sought to be established in this state, by the chancellor, in the case of *Mc Cartee* agt. *Orphan Asylum*, (*supra.*) In that case lands were devised to a corporation for a charitable use. A question was made before the chancellor, whether the devise was directly to the corporation, or to trustees in trust for

it. And although our statute of wills contained the same exception as that of 34 Henry VIII, by which corporations were excepted from those who might take by devise, and the devise was held to be direct to the corporation, yet the learned chancellor was of the opinion, notwithstanding, that the devise might be sustained as being for a charity, on the authority of the English cases. But the court of errors held, reversing the decree of the chancellor, that the devise was direct to the corporation, and that although it was, by its charter, authorized to take and acquire lands by *purchase*, this did not authorize it to take by devise, and although the devise was for a charitable purpose, it was equally within the prohibition of the statute.

If we recur briefly to the history of the English law on the subject of holding lands by corporations, we shall be satisfied that judges will not be warranted in giving such a construction to our statute of uses and trusts as would effectually overthrow the policy of the system of legislation not only in England, but in this country, and substantially revive the state of things here, which the statutes of mortmain were intended to and did prevent there.

Alienation in mortmain, (*in mortua manu*,) says Blackstone, (2 *Black. Com.*, 268,) is an alienation of lands or tenements to any corporation sole or aggregate, ecclesiastical or temporal. But these purchases having been chiefly made by religious houses, in consequence whereof the lands became perpetually inherent in one dead hand, this hath occasioned the general appellation of mortmain to be applied to such alienations, and the religious houses themselves to be principally considered in forming the statutes of mortmain; in deducing the history of which statutes it will be matter of curiosity to observe the great address and subtle contrivance of the ecclesiastics in eluding from time to time the laws in being, and the zeal with which successive parliaments have pursued them through all their finesses; how new remedies were still the parent of new

evasions, till the legislature at last, though with difficulty, obtained a decisive victory.

Lord HARDWICKE, in his opinion in *Attorney-General* agt. *Day*, (1 *Vesey, sen'r*, 223,) says : " It is worth observing how early laws were made to prevent the mischief of mortmain, viz : about the third century, by one of the first christian emperors."

By magna charta, (36 *Henry* III, *ch.* 36, 1258,) it was declared that it should not be lawful to any to give his lands to any religious house, and to take the same land again to hold of the same house, nor should it be lawful to any house of religion to take the lands of any and to release the same to him of whom he received it. If any from henceforth gave his lands, and thereupon be convict, the gift shall be utterly void and the land shall accrue to the lord of the fee. But as this statute only extended to religious houses, bishops and other sole corporations were not included therein, and the aggregate ecclesiastical bodies found many means to creep out of this statute, by buying lands that were *bona fide* holden of themselves as lords of the fee, and thereby evading the forfeiture, or by taking long terms for years, which first introduced these extensive terms for a thousand years or more. These caused the enactment of the statute, *de religiosis*, of 7 Ed. I, (1279,) which provided that *no person*, religious or otherwise, whatsoever, should buy or sell or receive, under pretence of right, a term of years, or any other title whatsoever, nor should by any act or ingenuity appropriate to himself any lands or tenements in mortmain, upon pain that the immediate lord of the fee, or on his default for one year, the lords paramount, and in default of all of them, the King might enter thereon as a forfeiture. This was intended as a sufficient security against all alienations in mortmain ; but as these statutes extended only to gifts and conveyances between the parties, the religious houses now began to set up a fictitious title to the lands which it was

intended they should have, and to bring an action to reco-
ver it against the tenant, who by fraud and collusion made
no defence, and thereby judgment was given for the reli-
gious house, which then recovered the land by sentence of
law upon a supposed prior title. But upon this the sta-
tute of Westminster 2d (13 *Edw.* I, *ch.* 32, 1285,) enacted
that in such cases a jury shall try the true right of the
demandant or plaintiff to the land, and if the religious
house or coporation be found to have it, they shall still
recover seisin, otherwise it shall be forfeited to the imme-
diate lord of the fee, or else to the next lord, and finally to
the King, upon immediate or other lord's default. And so
careful was this prince to prevent any future evasions, that
when the statute of *quia emptores* (18 *Edw.* III, 1290) abol-
ished all subinfeudations, and gave liberty to all men to
alienate their lands to be holden of their next immediate
lord, a proviso was inserted that this should not extend to
authorize any kind of alienation in mortmain. Blackstone
says : Yet still it was found difficult to set bounds to ecclesi-
astical ingenuity ; for when they were driven out of all their
former holds, they devised a new method of conveyance,
(and a similar evasion of our statutes we are called upon
to sanction in the present case,) by which the lands were
granted, not to themselves directly, but to nominal feoffees
*to the use* of the religious houses ; thus distinguishing be-
tween the *possession* and *the use*, and receiving the actual
profits while the seisin of the lands remained in the nominal
feoffee, who was held by the court of equity (then under
the direction of the clergy ; and it may be added that the
office of Lord Chancellor or Lord Keeper had, with few
exceptions, prior to the appointment of Sir Thomas Coven-
try in 1625 as Lord Keeper, been filled by an ecclesiastic)
to be bound in conscience to account to his *cestui que use*
for the rents and emoluments of the estates. And the
learned commentator informs us, that it is to these inven-
tions that our practisers are indebted for the introduction

of uses and trusts, the foundations of modern conveyancing. But it is added, that unfortunately for the inventors themselves, they did not long enjoy the advantage of their new devices; for the statute of 15 Richard II, (*ch.* 5, 1391,) enacted " that the lands which have been so purchased to uses should be authorized by license from the crown, or else be sold to private persons; and that *for the future*, uses shall be subject to the statutes of mortmain and forfeitable like the lands themselves." And it was recited in the statute, that the mortmain statutes had been eluded by purchasing large tracts of lands adjoining churches and consecrating them by the name of church yards, and thereupon it was declared that such subtle imaginations were within the compass of the statutes of mortmain. Blackstone further says, that civil or lay corporations, as well as ecclesiastical, were also declared to be within the mischief, and of course within the remedy provided by these salutary laws. During all this time it was in the power of the crown to amortize the lands so held or to be acquired, by granting a license of mortmain to remit the forfeiture, so far as related to its own right, and to enable any spiritual or other corporation to purchase and hold any lands or tenements in perpetuity; which prerogative is declared and confirmed by statute, (18 *Edw.* III, *ch.* 3, 1345.) But as doubts were entertained at the time of the Revolution in 1688, as to the power of the crown to grant such licenses, the statute of 7 and 8 William III, (*ch.* 37, 1696,) was passed, which recited that it would be a great hindrance to learning and other good and charitable works, if persons well inclined might not be permitted to found colleges or schools for encouragement of learning, or to augment the revenues already of those founded, by granting lands thereto, or by granting lands to other bodies politic or incorporate then in being, or thereafter to be incorporated for other and public uses, and thereupon it enacted that it should be lawful for the crown, as often as it should think

fit, to grant to any person, bodies politic or corporate, license to alien in mortmain, and also to purchase and hold in mortmain in perpetuity or otherwise, any land of whomsover the same shall be holden, which shall not be subject to forfeiture by reason of such alienation or acquisition.

Next in the point of time is the act of 9 Geo. II, (*ch.* 36, 1736,) entitled " An act to restrain the dispositions of lands whereby the same become inalienable." It recites that gifts or alienations of lands, tenements or hereditaments in mortmain are prohibited or restrained by *magna charta* and divers other wholesome laws, as prejudicial to and against the common utility; nevertheless the public mischief had greatly increased by many large and improvident alienations or dispositions, made by languishing or dying persons, or by other persons, to uses called charitable uses, to take place after their deaths, to the *disherison* of their lawful heirs; for remedy whereof it was enacted that after the the 24th of June, 1736, no manors, lands, tenements, rents, advowsons or hereditaments, nor any moneys to be laid out in the purchase of any lands, tenements or hereditaments, should be granted, &c., or anyways conveyed or settled to or upon any person or persons, bodies politic or corporate, or otherwise, for any estate or interest whatever, or anyways charged or incumbered by any person or persons whatsover, in trust or for the benefit of any charitable uses whatsoever, unless the same was conveyed by deed duly executed twelve months before the death of such devisor or grantor. And it was further enacted, that all gifts, grants, &c., of any lands, &c., or of any moneys to be laid out in the purchase of any lands, or of any estate or interest therein, or of any charge or incumbrance affecting the same *to or in trust* for any charitable uses whatsoever, which should be made after June 24, 1736, and not made in the manner therein prescribed, should be absolutely null and void.

In *Attorney-General* agt. *Day;* (*supra*,) Lord HARDWICKE

states what he thought were the sentiments of the Lords on the passing of this act. RICHARD PEPPER ARDEN, then master of the rolls, says, in *Corbyn* agt. *French*, (4 *Vesey, jun.*, 427,) that this statute was commonly called the statute of mortmain, but very improperly, for it does not prevent the alienation of land in mortmain, nor was that the object of the act; it had nothing to do with that. The object was to prevent devises of land or any interest in land, or bequests of money to be laid out in any such interests for any charitable use whatsoever. It should not be forgotten that the English judges imbibed the spirit which prompted the passage of this act, and they have administered it in its integrity. They have suffered no evasion of its language or encroachment upon its spirit and tenor, however specious, or however praiseworthy the objects to be accomplished. It is to be observed, that devises of land directly to a corporation, as well as those in trust for the corporation, are equally condemned by the act.

Such was the state of the law in England at the time of our separation from the mother country. These statutes thus in force there at the time of the settlement here, constituted a part of the law of the colony of New York, being brought hither by our ancestors who emigrated to this country from that. It is a natural presumption, and therefore is adopted as a rule of law, that on the settlement of a new territory by a colony from another country, especially where the colonists continue subject to the same government, they carry with them the general laws of the mother country which are applicable to the situation of the colonists in the new territory; and which laws thus become the laws of the colony, until they are altered by common consent or by legislative enactment. (*Bogardus* agt. *Trinity Church*, 4 *Paige*, 198.)

We think it impossible to believe that the legislature, in repealing the statute of Elizabeth and the statutes of mortmain, intended to revive and re-introduce in this state, the

system of pious and charitable uses; a system, by means of which in England, the clergy and the religious houses were enabled to possess themselves of nearly one-half of the real property of the kingdom, and if it had not been broken up, would doubtless have obtained the residue. The course of legislation in this state forbids, we think, such an assumption. We have seen that our statute of wills, enacted at an early day, excepted bodies politic and corporate from those who were rendered capable of taking lands by will, and on a revision at a later date, after judicial inquiry and discussion, an express prohibition to the same effect was made a part of the statute law. One of the revisers has put on record his views in reference to this alteration. He says: " As to the actual intention of the legislature, we are satisfied that the principal object of the alteration in the statute, which the revisers proposed, was to put an end to existing doubts as to the capacity of religious corporations, incorporated under the act of 1813 and previous acts on the same subject, to take by devise; and those doubts were meant to be terminated by compelling courts of justice so to construe those acts, as to exclude the possible implication that such an authority was given." (*Per* Duer, J., *Ayres* agt. *Methodist Church, supra.*) Whenever corporations in this state have been permitted to take lands by devise, a special act of the legislature has been obtained for that purpose, and corporations cannot take and hold real estate without the authority of the legislature by either special or general acts. This system of legislation is the equivalent to the license from the crown to hold lands in mortmain, and is the substitute therefor. It is the method adopted by us for amortizing lands. It must ever be a fundamental object with the legislature of a free people, whose institutions are based on the principle of equality, and which can only be maintained by preserving it, to prevent the accumulation of lands in the hands of perpetual bodies, whereby they are rendered inalienable, withdrawn

Downing agt. Marshall.

from the hope of attainment by industry and frugality, and from the purposes of commerce and trade. We have wisely abolished the system of entails and primogeniture but to little purpose, if we have permitted another to creep stealthily in, whereby the real estate of the state may be absorbed in dead hands and rendered inalienable forever. We cannot be too firm in resisting at the outset the introduction of a system so pernicious in its consequences, and fraught with such serious evils. Corporations never die, unless limited by their charter, and if they are well managed their tendency is to obtain the title to and control of large amounts of property. Religious corporations particularly, are proverbially without duration, and those organized under our general laws have life without limit. As long as our statutes speak the clear and emphatic language they now hold, these bodies cannot take land directly by devise, nor in any other way except to a limited amount; and it is believed that the inhibition is equally clear, that they cannot do it indirectly by means of a trust created, whereby another has the nominal possession, and they will be entitled to the rents and profits. A similar device was resorted to by the ecclesiastics in England, but which was uprooted and defeated by the statute of 15 Richard II, ch. 5. And if the views expressed in reference to our statutes of uses and trusts are correct, a like result has been attained in this state. It has ever been regarded as peculiarly the province of the sovereign power to create or call into being corporate bodies, and define their powers; and what reasons now exist for permitting an individual to do the same thing? For it is clear, that the power to create a trust for a charitable use or purpose does in fact call into being a corporation perpetual in its character, whose objects and purposes are defined only by individual caprice, and the extent of whose possessions is unlimited and beyond legislative control. A parent is only authorized by law to make provision for his children, to the extent of two lives in

being.   This is the extent to which the law permits him to render his property inalienable; but on the argument we are called upon to sanction a principle which will allow any amount of lands to be given by deed or will to trustees, whereby a trust is created for purposes called charitable, thereby rendering them inalienable forever.   On this theory a man is deprived of the power of providing but for a very limited period for those nearest and dearest to him, and who have the strongest claims upon his bounty and the best right to enjoy the fruits of his labor; but if he elects to create a trust for a purpose deemed by the courts charitable, it is to be sanctioned, and he permitted to devote his property to that purpose forever, and the lands thus disposed of are effectually put in mortmain.   A trust created to support soldiers, mariners, sick and maimed persons, schools of learning, free schools, scholars in universities; repair of bridges, ports and havens, common ponds, sea banks; for the support of orphans, houses of correction, young tradesmen, persons decayed, hospitals; to provide for the marriage of poor maids, and many other purposes, is deemed by the court charitable, and may be perpetually provided for, maintained and kept up, by appropriating therefor any conceivable amount of real estate, and which is thereby rendered inalienable forever.   Corporations thus created are emphatically the creatures of judge-made law.   I find no warrant in reason, authority, or statute law for upholding them.   I deem their existence hostile to the spirit and genius of our institutions, and to tolerate them would be taking a backward step and re-introducing a pernicious system which our ancestors so valiantly fought against and destroyed.   If we adhere to the plain letter of the will of our law-makers, our way is clear and environed with no embarrassments.   If we depart from the chart laid down for our guidance, we are at once afloat on a sea of uncertainty, and no one can tell where we land, or what principles will for the future be our guides.   I prefer to adhere to

the legislative will as I find it on the statute book, and I hold that no trusts in lands in this state can be created except such as are therein enumerated and authorized.

Neither of the corporations named in the testator's will being expressly authorized by the charter creating them, or by statute, to take lands by devise, they cannot legally take those given to them by his will, either directly to them or indirectly to trustees for them as *cestuis que trust*. The trusts, therefore, attempted to be created in the real estate by this will, for the benefit of these corporations, are illegal and prohibited by law.

An adherence to the same general policy is emphatically indicated by the act of the legislature of 1860, entitled "An act relating to wills." (*Laws of* 1860, *ch.* 360, *p.* 607.) It declares that no person having a husband, wife, child or parent, shall by his or her last will and testament devise or bequeath to any benevolent, charitable, literary, scientific, religious or missionary society, association or corporation, in trust or otherwise, more than one-half of his or her estate, after the payment of his or her debts, and such devise or bequest shall be valid to the extent of one-half and no more.

The judgment of the supreme court should therefore be affirmed in all respects, except as to that part of the estate of the testator covered by the seventh clause of the will, and in which his son John Stanton Marshall had a life estate, and as to that the judgment is to be modified in accordance with this opinion.