PHŒNIX et al. v. TRUSTEES OF COLUMBIA COLLEGE et al.

(Supreme Court, Appellate Division, First Department.   November 20, 1903.)

1. WILLS—CONVERSION OF REALTY INTO PERSONALTY—CONSTRUCTION—DEVISE TO COLUMBIA UNIVERSITY.

The testator devised and bequeathed the remainder of his estate, real and personal, to his executors in trust to receive the income and pay it to certain beneficiaries during their lives, and afterwards the principal to go to the trustees of Columbia University, to found certain professorships. The will conferred on the executors a general power of sale for administration. By codicil, testator made a specific devise of certain realty to his brothers for their joint lives; and, on the death of the

84 N.Y.S.—57

survivor, he devised the property to the trustees of the Columbia Uni-
versity "upon the same terms and conditions upon which the said trus-
tees shall have  *  *  *  my residuary estate, which by the terms of
my said will and codicils  *  *  *  will come to said college." He gave
his executors discretionary power, without personal risk to themselves,
to postpone the conversion of any part of his residuary personal·estate.
Testator then declared a change of purpose from the founding of pro-
fessorships to the providing of special laboratories, etc., directing that
his "residuary estate or" the proceeds, as the same might "come to the
possession of the said trustees  *  *  *  under the provisions of the
will," be applied to such substituted purpose. He expressed a wish that
"with said property" laboratories should be equipped, and that "no part
of the said property or its income" should be expended for salaries;
and then expressly provided that "in the event that the income of said
property in the possession of the trustees" should exceed what could be
judiciously expended for apparatus, etc., the trustees should employ it
for the library. The situation of testator's realty was not such as to
make it imperative that it be sold in order that the college might take
the benefit intended. *Held,* that there was no conversion of the real
estate into personalty, so as to make it competent for the college to take
the property irrespective of charter limitations on its power of holding
realty.

2. CONSTITUTIONAL LAW—IMPAIRMENT OF CHARTER OBLIGATION.
    The contractual dignity of a corporate charter, which prevents the
powers thereby conferred from being impaired by subsequent legislation,
does not require additional powers conferred by a subsequent charter,
which is accepted by the corporation,. to be interpreted in accordance
with the original grant.

3. CHARTER OF COLUMBIA UNIVERSITY—POWER TO HOLD REALTY.
    The original charter of Columbia College, granted in 1754, empowered
it to take and hold real estate, provided that the clear yearly value
thereof should not exceed £2,000. Subsequent statutes confirmed and
enlarged the powers of the college, and made various grants to it; among
them being the act of 1787 which created it a university (Laws 1787, p.
524, c. 82). Laws 1810, c. 85, recited that whereas the trustees of the
college had represented that sundry impediments to their trust and to
the interest of literature were found to exist, from certain restrictions
and defects in the charter, and had prayed relief, and that their charter,
when amended, might be comprised in one act, therefore it was enacted,
etc. The act provided that the trustees should be and remain forever a
corporation, and conferred upon them corporate powers—among others,
the right to hold real estate, provided that the clear yearly value of the
real estate "to be so acquired" should not exceed $20,000. The act con-
firmed to and vested in the trustees and their successors all the real
and personal estate formerly belonging to the university, and repealed
portions of the act of 1787. This act of 1810 was accepted by the uni-
versity. *Held,* that it constituted from that time the charter of the
university, and the limitation·of·its power to hold realty was only such
as was therein contained.

4. SAME.
    Property granted to the university prior to 1810 is not to be included
in computing the amount·the university is empowered to hold by the
charter of that year, as the limitation therein applies only to property
"to be acquired."

5. SAME
    Lands granted to the university by Laws 1790, p. 162, c. 38, and Laws
1802, p. 165, c. 105, in lieu of a grant made about 1776, but which was
afterwards ascertained to be within the state of Vermont, are not to
be considered in computing the amount of land the university is author-
ized to hold by the charter of 1810.

6. SAME.
    Land which the university was authorized to acquire by Laws 1857,
p. 259, c. 132, and Laws 1860, p. 61, c. 51, being held under the special

authority of those statutes, is not to be computed in determining the amount of realty which the university may hold under the limitation in its charter of 1810.

7. SAME.

Real estate on which the university held a mortgage is not to be computed in determining the amount of realty it could hold under the limitation in its charter of 1810.

Appeal from Judgment on Report of Referee.

Suit by Phillips Phœnix and another, executors and trustees of the last will and testament of Stephen Whitney Phœnix, deceased, against the trustees of Columbia College, George H. Warren, and others. From a judgment for the college entered on the report of a referee, George H. Warren and others appeal. Affirmed.

Argued before HATCH, McLAUGHLIN, PATTERSON, INGRAHAM, and LAUGHLIN, JJ.

W. B. Hornblower, for appellants.

C. L. Jones, for respondents.

PATTERSON, J. The appeal in this action is from a judgment of the Special Term giving construction to the last will and testament of Stephen Whitney Phœnix, deceased, and settling the accounts of the executors and trustees under that will. The question we are called upon to decide is whether Columbia College, in the city of New York, has the right and power to take, under the will, so much of the residuary estate of the testator as consists of certain real estate, and the proceeds of other real estate realized by the executors and trustees under the execution of a power of sale contained in the will. The action was brought by the executors and trustees of the will, who, being in doubt as to the operative effect of its residuary clause, sought the aid and direction of the court, and asked it to define and determine conflicting claims made, on the one hand, by the heirs and next of kin of the testator, and the devisees and legatees of a sister of the testator, and, on the other, by Columbia College. The controversy is limited to the real estate, there being no dispute as to the right of the college to take the personal property under the provision for its benefit made in the will.

Stephen Whitney Phœnix, the testator, died in November, 1881, leaving a last will and testament, with codicils thereto, and such will and codicils were duly admitted to probate by the surrogate of New York on the 28th of November, 1881. The right of Columbia College to take real estate under this will and its codicils is challenged on the ground that at the time of the testator's death, and when his will became operative, its power so to take was exhausted by reason of its holding and owning realty up to and beyond the limitations and restrictions contained in its charter or charters. The cause was tried before a referee, who, in very learned and elaborate opinions, held that the college had the power to take the provision made for it by the testator, both as to the real estate passing under the will and the personal property: and from those opinions, and the findings made by him, it would appear that his decision rests upon three grounds, which may be stated as follows: First. That under the

terms of the will, and in view of the intention of the testator, gathered from such terms, and from his purpose in making the gift to the college, and from such considerations as legitimately may be resorted to to ascertain intention, that gift is to be considered as entirely one of personalty, or, in other words, that, to make the gift effective, and to carry out the intention of the testator, the property will be regarded as having been equitably converted from realty into personalty. Second. That the right of Columbia College to take, or to take and hold, real estate, is determinable by the law as it existed in the colony of New York at the time the original charter was granted to that institution of learning, in the reign of King George II; that, according to that law, the statutes of mortmain of England furnish guides for the construction of that charter, which, in effect, was a license in mortmain; that the college was at that time entitled to take real estate to any amount, subject only to the condition that an excess beyond the amount authorized by the charter might be taken away by the King, or subsequently by the state, as the successor of the King; that the charter, with its legal incidents, is a contract which cannot be impaired by legislation; and that the heirs at law of the testator, or those claiming under them, have no standing to wage a contest respecting this residuary estate, or the proceeds of such real estate as has been sold by the executors and trustees under the power of sale. Third. That at the time of the death of the testator, and when his will became operative, Columbia College had not, in fact or in law, exhausted its power to take and hold real estate, or its proceeds, under the will of the testator.

The provisions of the will and codicils thereto of Mr. Phœnix, so far as they are material to the present discussion, may be summarized as follows:

After making specific bequests, he gives, devises, and bequeaths all the rest, residue, and remainder of his estate, real and personal, as follows:

"One equal undivided third part thereof to my executors and trustees hereinafter named, or the survivors or survivor of them, or their or his successors or successor, in trust to receive the rents, issues, profits, income and interest to accrue thereon, and to pay the same, after deducting all lawful charges incurred in upholding said estate, to my said sister Mary Caroline Warren, wife of George Henry Warren, in semiannual payments, during the term of her natural life, and upon her death, or upon my death, should I survive my said sister, I give, devise and bequeath the principal of said share to the Trustees of Columbia College in the City of New York, for the purpose of founding and maintaining one or more professorships in the scientific department of said College, now known as the School of Mines, or by whatever name the same may be hereafter called."

He then proceeds to make a similar specific disposition of another third part of the residuary estate, with the life beneficiary changed to his brother Phillips Phœnix, and the third remaining equal undivided third part he disposes of in the same words, with the exception that his brother Lloyd Phœnix is made the beneficiary for life. By the ninth clause he provides as follows:

"I authorize and empower my said executors and trustees and the survivors or survivor of them, or their or his successors or successor, at any time, to sell, mortgage, lease or convey any portion of my real estate, whether

owned by me severally or jointly; to make exchange of all or any portions thereof, and to unite in amicable partition thereof. Giving them full power to make and execute all lawful deeds or other assurances in the premises. It is my wish that all real estate owned by me jointly with my sister and brothers, or with other persons may be held in common so long as may be necessary to protect the interests of my estate and the estates of my said sister and brothers, and said other persons, providing the same may lawfully be done." ·

He then appoints executors and trustees. Of the two codicils annexed to the will, the first has no pertinency at the present time. By the second he makes a specific disposition of a piece of real estate known as No. 176 Madison avenue, in the city of New York, with a stable and lot on Thirty-Third street, adjoining the same, which he gives to his brothers Phillips and Lloyd Phœnix for their joint lives, and to the survivor of them for his life; and upon the death of the survivor he devises the house and lot and stable to the trustees of Columbia College, in the city of New York—

"To have and to hold the same to said Trustees of Columbia College forever, upon the same terms and conditions upon which the said Trustees shall have the one-third of my residuary estate, which, by the terms of my said will and codicils, at the same time, to wit, the death of said survivor, will come · to the said College."

Then he proceeds to declare that the executors and trustees and their survivors, etc.—

"Shall have a discretionary power, and without personal risk to themselves, to postpone to such time as they may deem expedient, the conversion or getting in of any part of my residuary personal estate which shall consist of stocks, funds or securities of any description whatever; and that they or he may hold and retain the same for the purposes of the trusts in my said will created and declared, and for the delivery of the same in kind to the Trustees of Columbia College at the determination of such trusts respectively, as provided by my said will."

Then the testator declares that:

"In lieu of the founding and maintaining of professorships in the Scientific Department of said College, known as the School of Mines, or by whatsoever name the same be hereafter called, as in my said will provided; I do Will, order and direct that my said residuary estate or the proceeds or avails thereof, as the same may from time to time come to the possession of the said The Trustees of Columbia College in the City of New York, under the provisions of my said will and the codicils thereto, shall be employed in providing instruments, apparatus and material for the equipment and use of special laboratories for study, instruction and original research in Physics and Chemistry in the said College and in the publication of the results thereof."

He expresses a wish, without making it obligatory upon the trustees, that "with said property" there should be equipped and maintained certain laboratories for scientific purposes and that "no part of the said property or its income" shall be expended in the payment of salaries and then expressly provides that:

·"In the event that the income of said property in the possession of the Trustees of Columbia College or their successors, shall exceed the amount that can be judiciously expended for apparatus, instruments and material for use in such laboratories, then, that the said Trustees of Columbia College employ such portion of the surplus, as they may deem proper, in the purchase of books and journals relating to Physics and Chemistry for the library

of said College. And if a surplus shall still remain that the said Trustees of Columbia College may use the same in the erection of additional buildings to be occupied as laboratories; but only, under such circumstances, do I wish any portion of the said property to be expended upon buildings."

The testator then declares that it is his will that, in case the provisions of this codicil in respect to the gift to the trustees of Columbia College, shall fail by reason of any invalidity of the same, the original bequest and devise to them contained in the will shall remain and stand as though the codicil had not been made.

Upon a careful examination of the provisions of the will under consideration, we are not able to concur with the view of the learned referee that Columbia College takes the residuary estate as personal property. The inquiry is as to the intention of the testator. It is the rule of law in this state that such intention must appear plainly, distinctly, and unequivocally. Scholle v. Scholle, 113 N. Y. 261, 21 N. E. 84; Clift v. Moses, 116 N. Y. 144, 22 N. E. 393. An intention to convert may be manifested in various ways: First, by a positive direction to the executors or trustees to make it, which is not this case, for there is no command that a sale be made; second, the intention may be ascertained from the necessity of a sale in order to carry out the general scheme of a testator, which is also not this case, for the general scheme here is merely the creation of life interests in undivided thirds, with remainders over to Columbia College upon the expiration of the particular estates; and, third, the property may be deemed to be equitably converted when the purpose of the testator would fail without such conversion. In the present case there is nothing but a discretionary power of sale. It is one of the class sometimes referred to as powers for administration to aid in the convenient settlement of estates. The executors and trustees are authorized and empowered either to sell, mortgage, or exchange all or any of the real estate which the testator owned jointly or in severalty. In Dodge v. Pond, 23 N. Y. 69, it is said that where a testator authorizes his executors to sell real estate, and it is apparent from the general provisions of the will that he intended the estate to be sold, the doctrine of equitable conversion applies, even if the power of sale is not mandatory. In that case it appeared that the will was incapable of execution unless it were held that the property had been converted. In Asche v. Asche, 113 N. Y. 235, 21 N. E. 70, it is said that the necessity of a conversion to carry out the purpose of a testator will be deemed to be a positive direction to convert; but in Chamberlain v. Taylor, 105 N. Y. 194, 11 N. E. 625, it is remarked that an equitable conversion never will be presumed unless it is required to carry out a lawful purpose expressed in the will of the testator. So, also, in the Matter of Tatum, 169 N. Y. 518, 62 N. E. 580, it is said that, unless the purpose of the testator will fail without a conversion, equity will not presume it. If the property is to be deemed as equitably converted, it would become the duty of the executors or trustees to sell. In White v. Howard, 46 N. Y. 162, it is said that, in order to constitute the conversion of real estate into personal, it must be the duty of, or obligatory upon, the trustees to sell it in any event. If an equitable conversion is operated here, the trustees of Columbia Col-

lege would be entitled to receive the residuary estate as money; but it is evident from an examination of the terms and provisions of the will now before us that the testator intended that the college should receive that residuary estate in the form in which it existed at the expiration of the beneficial interests of the life tenants, respectively. This will was evidently prepared by a skilled draftsman. Looking at the instrument itself, and without reference to the second codicil, we find the intention of the testator clearly expressed that the remainder interests shall go to Columbia College in the manner suggested, for as to each of those interests the testator provides not only for a gift over after the death of his sister and each of his brothers, but specifically makes provision that, in case of the death of either of them before he (the testator) dies, then the whole of the undivided equal third part shall pass to the college as a direct gift, for the purpose of founding and maintaining professorships in the college. With those provisions is associated, by a subsequent clause of the will, only the general power of sale for administration above referred to.

We de not find in the second codicil anything which requires us to adjudge that the realty had been converted into personalty. It may be convenient for the college to receive the provision made for it in that form, but the test is the intention of the testator. The learned referee seems to be impressed with the necessity of such a conversion, because of the purpose to which the gift is to be applied, but it can be so applied in the hands of the college as well as through a sale made by the executors. In critically examining the codicil, it is plain to us that the testator intended that the residuary estate should pass in the manner above indicated. By the fourth clause of the codicil, there is a specific gift to the testator's brothers of the Madison avenue property, for life; and on their death it is devised to the trustees of Columbia College, to hold the same forever upon the same terms and conditions upon which the said trustees shall have the one-third of the residuary estate "which by the terms of my said will and codicils, at the same time, to wit, the death of said survivor, will come to the said college." There is the plain indication that, notwithstanding the declared purpose to which the residuary gift is to be applied by the college, real estate is to go to it by devise for that express purpose, showing that it was not in the mind of the testator that, in order to effect his beneficent intention to the college, it was necessary to convert his realty into personalty. Again, in declaring his change of purpose from the founding of professorships to one providing for the equipment of special laboratories in the college, the testator orders and directs that his residuary estate, or the proceeds or avails, as the same may from time to time come to the possession of the said trustees of Columbia College, in the city of New York, under the provisions of the will, shall be applied to the substituted or changed purpose. Here is a provision which contemplates that the residuary estate in kind shall pass to the trustees, and in a subsequent part of the codicil he refers to the income of the property in the possession of the trustees of Columbia College, or their successors. The fifth paragraph of the second codicil does not aid the contention that an equitable conversion of

the real estate was intended by the testator.. That paragraph merely refers to what is called "the conversion or getting in" of stocks, funds, or securities constituting the residuary personal estate of the testator, and furnishes a protection to the trustees for not changing the securities into such investments as the law requires, or what are called "court securities." Nor was the situation of the real estate of the testator such as would make it imperative that it be sold in order that the college might take the benefit intended for it by the testator.

Upon a fair construction of the will and the codicil, we must reach the conclusion that not only is the intent to have the realty converted into personalty not clearly and unequivocally expressed, but that it is plain that the testator intended that the college should take the residuary property as it should stand when the trust estates terminated.

We are not able to accept the conclusion of the learned referee that the power of Columbia College to take real property under the will of Mr. Phœnix is to be determined exclusively by the law as it existed in the colony of New York at the time the charter was granted, in 1754, to the college. The right and power of the college in that regard are not derived only from the royal charter, but come from an enlarged and additional and new authority contained in the charter of 1810, granted by the state of New York. The referee's proposition, if we apprehend it correctly, seems to be that every question of power is referable to that royal charter, and the colonial law as it existed when that charter was granted; that it constitutes a contract made with the corporation, confirmed by the state Constitution of 1777, and all subsequent state Constitutions, the obligation of which, as a royal grant, made prior to October 13, 1775, cannot be impaired. Apparently, as the learned referee understands the law as it existed when the original charter was granted, the college had unlimited power to take real property, subject only to liability to forfeiture by the King of an excess in value of property so taken over and above the amount specified in the charter. A thorough and exhaustive argument has been made in support of that view by counsel for the college, and recourse has been had to all accessible sources of information to ascertain what the law of the colony, which is assumed to have been the law of England, relating to the subject, was, but we are not convinced that the views of the referee should prevail. A grant or devise of realty would be effective either to pass title from the grantor or devisor, subject only to the right of the sovereign to enforce a forfeiture, or the limitation of the power contained in the charter would operate as a proviso, the effect of which would be to render a grant or devise in excess of that limitation void if the proviso has any efficacy at all. If the referee's view is correct, it is to be sustained upon the theory that the statutes of mortmain were in force in the colony of New York when the royal grant to Kings College was made; but he seems to be of the opinion that those statutes were not in force at that time, and yet they have been applied as if they were. The appellant's contention is that the law of the colony of New York applicable to this case was identical with that of the state of New York, as declared in Chamberlain v. Cham-

berlain, 43 N. Y. 424, and Matter of McGraw, 111 N. Y. 66, 19 N. E. 233, 2 L. R. A. 387. We do not regard it essential to the decison of this case that we should rule upon that contention, but, if it were necessary, we would strongly incline to the view that the prohibition upon taking real estate beyond a certain amount, contained in the royal charter, made void the excess, and that the statutes of mortmain are not applicable.

We are aware that there are dicta of learned judges to the effect that such statutes were operative in the state of New York up to the time of the repealing act of February 27, 1788. Judge Wright remarks in Yates v. Yates, 9 Barb. 338, that there is positive evidence that the British statutes of mortmain were in force in the colony of New York, but that evidence is not referred to; and Judge Duer, in Ayres v. Methodist Church, 3 Sandf. 368, states that there is certain evidence that the statutes of mortmain were in force prior to 1788, and refers to section 4 of chapter 18, p. 615, of the Acts of 1784, as authority. That was an act to enable religious denominations in this state to appoint trustees, who should be a body corporate, for the purpose of taking care of the temporalities of their respective congregations, and for other purposes; and by section 4 certain powers and authority are vested in them, allowing them to take by gift, grant, or devise, although "such gift, grant or devise, may not have been strictly agreeable to the rigid rules of law, or might on strict construction, be defeated by the operation of the statutes of mortmain," which is not a legislative declaration that those statutes existed, but only an intimation that they may have existed. Chancellor Kent says that the statutes of mortmain never had effect in this country. Kent's Commentaries (3d Ed.) p. 343. And Blackstone says that "colonists carry with them only so much of the English law as is applicable to their own situation and that of the infant colonies." Mr. Fowler, whose extensive and accurate learning on this and cognate subjects entitles him to be regarded as an authority, goes no further than to say in his book on Charitable Uses that it has been stated that the mortmain statutes had been operative in this state. But it has been generally understood that they were in force nowhere in the United States, except in Pennsylvania, although a mortmain policy, independent of the English statutes, has prevailed in many of the states. The view entertained in England is that the statutes did not extend to the colonies, not only referring to the act of George II, which it is admitted was not in force here, but to the whole series, from Magna Charta (9 Hen. III, c. 36), through 7 Ed. I, c. 1; 34 Ed. I, c. 3; 13 Ed. III, c. 15; 15 Richd. II, c. 5; 23 Hen. VIII, c. 10; 7 & 8 William III, c. 37; and down to the Georgian statute, which is only an extension of the prior acts.

We are also aware that in Bogardus v. Trinity Church, 4 Sandf. Ch. 758, the learned vice chancellor held that the question as to the taking or holding of real estate by a corporation in excess of the annual value authorized by its charter is one between the corporation and the sovereign power, in which individuals have no concern, and of which they cannot avail themselves in any mode against the corporation. But in the McGraw Case, supra, Judge Peckham, writing for

the court, says that the observation of the vice chancellor in the Bogardus Case that only the sovereign power would have the right to question the right or power of a corporation in taking land was mere obiter dictum, and that, upon an examination of all the cases cited by the learned vice chancellor, facts were not presented which required a determination of that question; and we are constrained to take the same view of the vice chancellor's remark. The opinion of Robertson, C. J., in Lathrop v. Commercial Bank, 8 Dana, 114, 33 Am. Dec. 481, is instructive and convincing as to the effect and operation, locally only, of the English statutes of mortmain, and his citations from the opinions of English judges as to those statutes not extending to British colonies are very much in point.

It is, however, unnecessary to prolong this discussion or inquiry, for, as we view this case, involving as it does only the particular question of the power of Columbia College to take under the will of Mr. Phœnix, we are not called upon to decide whether or not the statutes of mortmain applied in the colony of New York, for, as previously remarked, the power to take under this will is not derived exclusively from the charter to Kings College. We may assume that under that charter the state alone could raise the question, but under subsequent charters the additional grant of power comes from the state; and, as we think, the power, its incidents and legal quality, are to be determined by the law of the state as it existed when the charter giving the increased power was granted. If that is so, we see no reason why the rule laid down in the McGraw Case does not apply to the charter granted by the state of New York in 1810. The effect of this view is to allow those contesting in this action the power of Columbia College to take, to maintain a controversy in this court.

It becomes appropriate at this point to advert to the history of the chartered powers of Columbia College to take and hold real estate, and to refer to the various sources of that power as contained in legislative enactments and grants. All of such legislative enactments are enlargements of power, and not restrictions. If it is said that the original royal charter constitutes a contract with the college which cannot be impaired, and that such contract includes power to take and hold real estate, subject only to forfeiture by the sovereign, then the prohibition upon impairment of the contract would apply only to the power acquired under that charter, and not to the additional power conferred by another charter, granted by the state, accepted by the corporation, and to be construed and exercised in accordance with the laws of the state. The additional grant of power thus made and accepted was not made subject to the law existing when the original charter was granted, but subject to the law existing when the additional power was bestowed.

In examining the legislative enactments and the grants, both colonial and state, made to what is now Columbia University, one cannot fail to be impressed with the importance attached to that institution in the system of education in New York. As early as 1746 (Laws 1746, c. 840) an act was passed entitled "An act for raising the sum of two thousand, two hundred and fifty pounds, by a public lottery for this colony, for the advancement of learning and

towards the founding of a college within the same." In 1748 and 1751 other acts were passed providing that money be raised by way of a lottery for erecting a college within the colony. In May, 1754, a petition was presented (by certain persons mentioned in one of the enactments referred to) to the "Lieutenant Governor and Commander in Chief of the Province of New York, and Territories thereon depending in America," in which it was represented that the rector and inhabitants of the city of New York in communion of the Church of England, as by law established, had offered, for the use of a seminary or college, certain valuable lands on the west side of the Broadway, in the West Ward of the city of New York, and were ready to convey the said land on certain conditions, and thereupon it was prayed that a charter of incorporation be granted to a college; and such charter was granted on October 31, 1754. That is the origin of the corporate existence of Columbia University. This charter provides that there shall be a body corporate and politic, called by the name of the Governors of the College of the Province of New York in the City of New York, in America, and among the powers granted by the charter are those "to purchase, take, hold, receive, enjoy and have any messuages, houses, lands, tenements, hereditaments and real estate whatsoever, in fee simple or for a term of life or lives, or years or in any manner howsoever, for the use of the said college; and, provided always the clear yearly value thereof do not exceed the sum of two thousand pounds sterling, and also, goods, chattels and annuities of any nature or kind whatsoever." The college was also known as the Kings College, and by chapter 51, p. 686, of the Laws of 1784, certain privileges were granted it by the state of New York, and its name was changed to Columbia College. That act provided that all the rights, privileges, and immunities theretofore vested in the college be vested in the regents of a university, who were erected into a corporation, and enabled to hold, possess, and enjoy those rights, privileges, and franchises which pertained to the college; but in 1787 an act was passed to institute a university within the state, and by it were repealed the acts of 1784. The act of 1787, p. 524, c. 82, provides for the establishment of a university to be called and known as the Regents of the University of the State of New York. The lands referred to in the petition of 1751, which preceded the granting of the charter in 1754, had been conveyed by the "rector and inhabitants of the City of New York in communion with the Church of England, as by law established" (which is the Trinity Church Corporation); and the act of 1787 ratified the charter of 1754, and provided that the power, authority, and rights granted and vested in the governors of the College of the Province of New York were thereby granted to and vested in the trustees of Columbia College, in the city of New York, and all the lands, tenements, hereditaments, etc., whereof the governors of the College of the Province of New York were seised, or with which the regents of the university were invested for the use and benefit of Columbia College, were vested in the trustees of Columbia College for the use and benefit of the college, with power to grant and sell the same. But it was provided that the lands given and granted to the governors of the College of the Province of New

York, in the City of New York, in America, by the corporation here-tofore styled "the Rector and Inhabitants of the City of New York in Communion of the Church of England, as by Law Established," "on part of which the college is erected," shall not be granted for any greater estate or in any other manner than. is limited by the said charter. In 1792, 1796, and 1802 various acts were passed granting lands and pecuniary aid to Columbia College, but it is not important to consider them in connection with the subject now before us. In March, 1810 (Laws 1810, c. 85), an act was passed by the Legislature of the state of New York entitled "An act relative to Columbia Col-lege in the City of New York." That act is all-important. It recites that:

"Whereas the trustees of Columbia College in the City of New York have represented that sundry impediments to their trust, and to the interest of literature in the college, are found by experience from certain restrictions and defects in their charter, and have prayed relief, and that their charter, when amended, may be comprised in one act, therefore, be it enacted," etc., that certain persons named in the statute, and who are referred to as to the then present trustees of the said college, and their successors, "shall be and remain forever a body politic and corporate in fact and in name, by the name of the Trustees of Columbia College in the City of New York, and by that name shall and may have continual succession forever hereafter, and shall be able in law to sue and be sued, implead and be impleaded, answer and be answered unto, defend and be defended in all courts and places whatsoever and may have a common seal, and may change and alter the same at their pleasure, and also, shall be able in law to take by purchase, gift, grant, devise, or in any other manner, and to hold any real and personal estate whatsoever: provided always, the clear yearly value of the real estate to be so acquired shall not exceed the sum of twenty thousand dollars, and also that they and their successors shall have power to give, grant, bargain, sell, demise or other-wise dispose of all or any part of the said real and personal estate as to them shall seem best for the interest of the said college."

Then follow provisions concerning the general powers pertaining to the college as an institution of learning, and by the ninth clause it is enacted that:

"All the real and personal estate whatsoever and wheresoever, which were formerly vested in the Governors of the College of the province of New York, in the City of New York, in America, or in the trustees of Columbia College, in the City of New York, be and the same is hereby confirmed to and vested in the said trustees of Columbia College in the City of New York, and their successors forever, for the sole use and benefit of the said college; and that it shall and may be lawful to and for the said trustees and their successors to grant, bargain, sell, demise, improve and dispose of the same, as to them shall seem meet: provided always, that the lands given and granted to the Governors of the College of the Province of New York, in the city of New York, in America, by the corporation heretofore styled 'The Rector and. In-habitants of the City of New York, in Communion with the Church of Eng-land, as by law established,' on part whereof the said college is erected, shall not be granted for any greater term of time than sixty-three years."

Then this statute proceeds to repeal the eighth, ninth, tenth, and eleventh sections of the act of April, 1787; that being the act to in-stitute the university within the state for purposes therein mentioned.

This act of 1810 was accepted by Columbia College. It very great-ly enlarges and expands the power of the college respecting the amount and value of real estate it is authorized to acquire; and that

increased amount is over and above such real estate as the college was authorized to take under the royal charter, or any other prior grant of power, if there be any, colonial or state. By the ninth section of the act of 1810, absolute dominion over the property vested in the governors of the College of the Province of New York, in the city of New York, or in the trustees of Columbia College in the City of New York, was given and the ownership of that property, "whatsoever and wheresoever," was confirmed as vested in the trustees of the college and their successors, and full power was given to grant, bargain, sell, demise, improve, and dispose of the same, with a limitation as to the term for which leases might be granted of the property derived from Trinity Church. In the grant of power, under the act of 1810, new and additional and different authority to take and hold real estate is conferred; and, by the terms of the grant, the power is one to be exercised in futuro, and irrespective of the already existing power to take. It is not tacked or grafted on to the old power, and conferred subject to laws long since repealed, if they ever existed. It is an original grant. The words are that the college "shall be able in law to take by purchase, gift, grant, devise, or in any other manner, and to hold any real and personal estate, the clear yearly value of the real estate to be so acquired, shall not exceed the sum of twenty thousand dollars," etc. The act of 1810 "was plainly designed thenceforth to be the charter of Columbia College," and, as said before, it was accepted by the college as such. If our conclusion respecting this charter of 1810 is right, we are simply required to consider whether or not, at the time of the death of Mr. Phœnix, the testator, the power of Columbia College to take real estate had been exhausted; and this invites an inquiry as to the real property it held at that time, namely, in the year 1881.

The evidence in the record shows that at the time of the testator's death the college had not acquired, under the power conferred by the charter of 1810, real estate, the annual value of which exceeded the limitation contained in that charter. As we read this record, the contention of the college is maintained by the evidence, namely, that the real estate owned by it in 1881 consisted of property acquired before the act of 1810 was passed, and property acquired thereafter by special legislative grant or authority; and we concur in the conclusion of the referee that the legislative intent with respect to the special grants "was to give an additional power to purchase additional property, not then expected to produce income, and that the land so purchased was not to enter into any estimate of annual value of property acquired under powers conferred by the original charter and the act of 1810." We are of the opinion that these special acts conferring entirely new powers of acquisition are to be read as though they declared that, in addition to powers theretofore granted, Columbia College should have the right to take and hold certain designated pieces of property. The real estate concededly owned by the college in 1881 consisted of three pieces:

First. The property that was conveyed by Trinity Church for the use of the college, prior to the charter of 1754, and two water lots which were granted by the city in 1770. All that property must be

excluded from the computation, because the grant of power contain-
ed in the charter of 1810 confirms its ownership in the college, and
specifically refers to the new power to take, as applying to real estate
to be acquired.   We think the legislative intent is clearly expressed
that the new authority conferred upon the college is over and above,
and beyond and irrespective of, the real estate which it held prior to
the year 1810.

The second piece is called the "Upper Estate of the Botanic Gar-
den Property," which was granted by the state to the college in the
year 1814, and is held entirely independent of the limitation contained
in the charter of 1810.   As is argued by the counsel for the col-
lege, the grant coming from the state itself would not have been
invalid, though the corporation had had no previous power to take
and hold real estate.   But considering the history of this particular
grant, we think it is manifest that the Legislature intended that it
should be a grant to the college independently of the charter limita-
tion.   To quote from the record:

"The colony of New York, or the state of New York, shortly after the
Declaration of Independence, undertook to convey to Columbia College cer-
tain lands in what was called the 'County of Gloucester,' in the township of
Norbury.   In the discussion which followed, in the difficult times, for the set-
tlement of what is now the state of Vermont, it was then called the 'New
Hampshire Grants.'   The rectification of the boundary line shows that what
the colony of New York claimed to be the county of Gloucester, as a matter
of fact fell within the state of Vermont; and no title ever passed to the
trustees of Columbia College with regard to that tract of about 24,000 acres.
The title failed absolutely on the ground that the property was not within
the limits of the colony or the state of New York; and that was urged on
the Legislature from time to time as a reason why, in those early days, we
should have certain consideration in the way of help, because we had lost
that grant of land which they had attempted to give us."

It also appears in the record that by chapter 38, p. 162, of the Laws
of 1790, and chapter 105, p. 165, of the Laws of 1802, the regents of
the university were authorized to grant and convey to the trustees
of Columbia College and Union College, and their successors, those
lands and others.   It was intended by the state of New York that the
proceeds of these lands should be used for the colleges and for acade-
mies throughout the state which were chartered by the regents.   The
title to the lands was never taken by Columbia College, but it received
certain proceeds after they were sold by the regents.   The grant of
the Upper Estate, so called, to Columbia College, was apparently
made as a compensation for the loss which the college would sustain
by reason of its inability to receive the benefit which it was intended
it should derive from the lands situated in Vermont; and thus the
inference is justified that there was a specific intent of the Legislature,
in granting this Upper Estate to the college, to indemnify it for the
loss of a substantial gift made prior to 1810 by an independent grant,
which should not be in any way affected by the limitation contained
in the charter of 1810.

The third piece of property admittedly owned by the college in 1881
is called the "Educational Site."   It is the property at 49th street and
Madison avenue, in the city of New York.   It was acquired by the
college under authorization contained in two acts of the Legislature,

the first being chapter 132, p. 259, of the Laws of 1857; and the other, chapter 51, p. 61, of the Laws of 1860. By the first-mentioned act the trustees of Columbia College were authorized to purchase and take and hold in fee simple and dispose of all land bounded northerly by the southerly side of 50th street, southerly by the northerly side of 49th street, easterly by a line parallel with, and 100 feet distant westerly from, the westerly side of 4th avenue, and westerly by a line parallel with, and 500 feet distant easterly from, the easterly side of 5th avenue, or any part or parts thereof, and dispose of the proceeds for the use and purposes of said college. By the act of 1860 the college was authorized to take and hold in fee simple additional land contiguous to that mentioned in the act of 1857. This land was taken and held under the special authority of those statutes. They were passed with the knowledge of the Legislature of the limitation contained in the act of 1810, as must be presumed. It is sufficient to repeat, with respect to this property, what has before been remarked— that the specific power to purchase it is to be regarded as an additional authority to the college, and does not enter into an estimate of annual value of property acquired under the act of 1810. But there are two other pieces of property which it is claimed by the appellant must be regarded as having been owned by the college in 1881. Those other pieces are referred to as the Wheelock property, at 11th avenue and 161st street, in the city of New York, and certain lots on East 129th street. Concerning the Wheelock property, it appeared in evidence that it was bought in 1872, and title was taken in the names of Messrs. Ogden, Nash, and Swords, as joint tenants. It was held by them until December, 1884. Mr. Nash then, as surviving joint tenant, conveyed it to the trustees of Columbia College. When the three gentlemen named took the property, in 1872, an agreement was entered into between them and the trustees of Columbia College looking to the ultimate acquisition by the college of the property. That agreement is not a declaration of trust. It may well be that there was the ulterior intention that the college should become the owner of this property, but it appears that the three gentlemen made a mortgage of the property to the trustees of Columbia College, and they stipulated that in case they were reimbursed every sum or sums of money which they might have paid on account of the mortgage, or of interest thereon, or for taxes and assessments, or for any of the purposes mentioned in the indenture, deducting therefrom any and all sums which may have been received by them for rent of the premises or for awards, or for any part thereof taken for public use, then they would grant and convey the premises to the trustees of Columbia College, except so much thereof as may have been taken for any public use. Whatever the real arrangement between these three gentlemen and the college may have been, the Wheelock property did not belong to the college until 1884; and we think, therefore, it was proper to regard the interest of the college in that property prior to 1884 as being that of a mortgagee. As to the East 129th street lots, the interest of the college was that of a mortgagee. A mortgage had been foreclosed, and the property was conveyed after the foreclosure sale to Messrs. Harper, Schermerhorn, and Ogden, as joint tenants, and they executed a mortgage

back to the college. This must be regarded as an investment on mortgage, and the college did not acquire the title until 1884.

It seems to be undisputed that the finding of the referee that the total annual value, at the time of the death of the testator, of the entire remainders which the testator attempted to devise to the trustees of Columbia College, was $9,898.76.

Briefly to recapitulate and formally state the conclusions at which we have arrived:

First. Columbia College does not take the residuary estate of the testator as personal property.

Second. The power of the college to take the residuary estate of the testator is not controlled by its charter of 1754, construed by the law as it then existed, respecting the powers of corporations to take and hold real property. The power of the college to take under the will of Mr. Phœnix is derived from the charter of 1810, which conferred a new power; and the right to question the validity of grants and devises in excess of the amount of real estate authorized to be taken by that charter does not inhere in the state alone, but such right may be questioned by the heirs of the testator, or those claiming under such heirs.

Third. At the time of the death of the testator, in 1881, Columbia College did not own real estate, the annual value of which exceeded the $20,000 limitation contained in the act of 1810.

The judgment appealed from should be affirmed, with costs. All concur.